HANSON BRIDGETT LLP
MATTHEW F. MILLER, SBN 172661
mmiller@hansonbridgett.com
BATYA F. FORSYTH, SBN 192346
bforsyth@hansonbridgett.com
SUSANNA L. CHENETTE SBN 257914
schenette@hansonbridgett.com
425 Market Street, 26th Floor
San Francisco, California 94105
Telephone:     (415) 777-3200
Facsimile:     (415) 541-9366

*Attorneys for Plaintiffs*
ELIZA LABS, INC. and
SHAW WALTERS

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| ELIZA LABS, INC., a corporation, and SHAW WALTERS, an individual,<br><br>Plaintiffs,<br><br>v.<br><br>X CORPORATION (fka TWITTER), a corporation,<br><br>Defendant. | Case No. 25-7243<br><br>**PLAINTIFFS ELIZA LABS, INC. AND SHAW WALTERS'S COMPLAINT FOR INTENTIONAL MISREPRESENTATION, FALSE PROMISES, CONCEALMENT, AND VIOLATIONS OF CAL. BUS. & PROF. CODE § 17200 AND SECTION 2 OF THE SHERMAN ACT, AND REQUEST FOR DAMAGES, TREBLE DAMAGES, ATTORNEY'S FEES, AND INJUNCTIVE AND DECLARATORY RELIEF**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Eliza Labs ("Eliza," or "Eliza Labs") and Shaw Walters ("Walters") (collectively, "Plaintiffs"), for their Complaint against Defendant X Corporation ("X," "X Corp," or "Twitter"), allege as follows:

## NATURE OF THE ACTION

1.      This case involves X Corp wielding its incredible monopoly power with perceived immunity from suit to deplatform users with the intent to restrain competition for launching AI Agents on the X Corp platform (Twitter).

2.    Perhaps considering itself immune for all deplatforming decisions regardless of effect and intent (it is not), X wielded this liability shield as a sword to thwart unwelcome competition, extract valuable information, and achieve a competitive business advantage by copying, and then banishing, one of the first successful developers of novel artificial intelligence products to run on X's platform so that X's follow-on copycat product could fill X's self-created void.

3.    Such conduct epitomizes exclusionary and predatory practices that federal and California law prohibit: leveraging monopoly control of an essential communications platform to suppress competition from innovative new entrants.

4.    On the wrong side of X's distortive deplatforming are Plaintiffs – open-source software developer Eliza Labs and its founder Shaw Walters – operating with the laudable intent to democratize access to artificial intelligence tools and crypto currency strategies so that the average person may compete with the tech giants in using these sophisticated, lucrative, and novel technologies. Plaintiffs were among the first, and perhaps most successful, software developers to create open source software to enable others to build artificial intelligence agents ("AI Agents") to operate on X's platform.

5.    Initially, X stoked Plaintiffs' development and passion for democratizing AI by hosting Eliza's founder Walters for meetings at X's offices, working closely with Eliza's developers to understand exactly how Eliza's approach and coding worked, and troubleshooting future developments, concerns, and possibilities for the use of autonomous AI software – aka AI Agents – on X.

6.    Plaintiffs engaged with X in good faith during this process, genuinely believing they were collaborating to create exciting AI advancements in data processing. Then one day, without notice, Plaintiffs could not log into their X accounts.

7.    Without warning or legitimate justification, X permanently suspended the accounts of both Eliza Labs and its founder, Shaw Walters.

8.    In the weeks leading to the deplatforming, X began to push Plaintiffs to adopt an exorbitantly expensive "Enterprise License" or "Enterprise API" (for $50,000.00/month, or

$600,000.00/year). Plaintiffs respectfully declined, citing their inability to afford the fee, about which X was well aware. Further, Plaintiffs knew that the $1,000/month they already paid X for Eliza's Developer License, the $200/month it paid for founder Shaw Walter's developer account, as well as the $10,000.00 it gave X for its "gold check," more than covered Plaintiffs' activities on X. Plaintiffs additionally further understood that there was no reason to switch to a slightly different, yet significantly more expensive, license; there was no additional functionality or access Plaintiffs needed to develop open source software. As long as Plaintiffs could access the platform, they had the information and access they needed to build their opensource AI offerings.

9.    On information and belief, X's *quid pro quo* demand for an Enterprise License was a pretextual barrier designed to exclude nonprofits, small developers, and open-source competitors – or any coders developing AI products to run on X's platform – from its platform.

10.    Regardless, shortly after refusing X's unnecessary and unconscionable $600,000.00/year license proposal, Plaintiffs found themselves unable to access X at all: X deplatformed Eliza and its founder, completely.

11.    Now obvious in retrospect, X's actions vis-à-vis Plaintiffs constituted a coordinated, fraudulent, and anticompetitive effort to extract money and information from Plaintiffs regarding their open source software and development process. X sought to bring its own AI Agents to life on X, while barring Plaintiffs, *so that X would not face competition from Plaintiffs' opensource activities.*

12.    This has now happened. X launched its nearly identical AI Agents while Plaintiffs remain deplatformed and while continuing to pump Plaintiffs for precise technical details and knowhow about its open source software offerings under the guise of evaluating whether to reinstate Plaintiffs' X accounts.

13.    X's conduct not only constitutes fraudulent misrepresentation, concealment, and false promises, but also is textbook anticompetitive conduct. X summarily deplatformed its competitor Eliza clearing the way for its own copycat product launched shortly after the suspension. X then delayed, throttled, and impermissibly inspected its competitor Eliza's product under the false pretenses of evaluating Eliza's compliance with X's terms and conditions and false

PLAINTIFFS' COMPLAINT FOR DAMAGES AND INJUNCTIVE AND DECLARATORY RELIEF

promises of reactivation.

14.    This Complaint seeks to redress X's unfair competition, unlawful use of monopoly power, and fraudulent misrepresentations by obtaining immediate account reinstatement for Plaintiffs and by making Plaintiffs whole in the amount of X's unjust enrichment from copying and supplanting Eliza's product, and Eliza's lost funding due to X's monopolistic deplatforming actions and interference with customer and follower relationships.

15.    For its anticompetitive and exploitative business decision to deplatform Plaintiffs, X is not above the law and not entitled to immunity. Such immunity exists only for publishing decisions that foster competition and support the free development of the internet. *See* 47 USC § 230(b). It does not exist to protect the anticompetitive business decisions of a monopoly internet platform abusing its position of power for profit.

16.    By exposing X's unlawful wielding of deplatforming to achieve business objectives, and by obtaining reinstatement and disgorgement of X's ill-gotten gains, Plaintiffs realize the policies of Section 230 "to promote the continued development of the Internet …  to preserve the vibrant and competitive free market that presently exists for the Internet … [and] to encourage the development of technologies which maximize user control over what information is received … [from] the Internet." 47 USC § 230(b).

## PARTIES

17.    Plaintiff Eliza Labs, Inc. is a Delaware corporation headquartered in San Francisco, California, with a principal place of business of 2 Embarcadero Center, Floor 8, San Francisco, CA 94111. Founded in 2024, Eliza Labs is the creator of the Eliza agent framework, an open-source platform designed to revolutionize the way autonomous AI agents are created, deployed, and managed. The Eliza framework enables powerful multi-agent simulations, empowering developers, researchers, and businesses to build advanced AI systems. Eliza Labs is committed to pushing the boundaries of AI technology to shape the future of intelligent, autonomous systems.

18.    Plaintiff Shaw Walters, an individual working and residing in San Francisco, California, is a California citizen and the founder of Eliza Labs. With a robust background in artificial intelligence and machine learning, Mr. Walters champions an open-source and

1  transparent approach to AI and developing innovative new publicly available and free software

2  plugins and tools that democratize access to the internet's vast troves of data so that all –

3  individuals and small and large corporations alike – may participate in data aggregation,

4  compiling, processing, sorting, responding, and predicting equally.

5      19.    Defendant X Corporation (pka "Twitter, Inc.") (referred to interchangeably herein

6  as "X," "X Corp," "Twitter," and/or "Defendant") is a Nevada corporation with a principal place

7  of business of 865 FM 1209, Building 1, Bastrop, TX 78602.

8      20.    Defendant X Corporation maintains a monopoly in the relevant market of "short

9  form public posting" social media that includes X Corporation and, on information and belief, the

10  newly formed alternatives to X, BlueSky and Facebook/Meta's new platform "Threads," both of

11  which are under two years old and, due to network effects, have not gained market power.

12  Notably, neither of these new platforms hosts any community or activities for AI or crypto. Crypto

13  is so synonymous with X that, the crypto community refers to X as "Crypto Twitter," or "CT,"

14  even after Musk's acquisition. Similarly with AI, the AI community refers to X specially as "AI

15  Twitter" or "TPOT," ("This Part of Twitter"). Because all of the AI social media discussions occur

16  on X, X has a monopoly over mindshare in the AI industry and thus is a monopoly here.

17      21.    As discussed *infra*, X's novel Enterprise License developments show that, even if

18  X imposes a small (or even large) but significant and non-transitory increase in price, users do not

19  defect to competitors but continue to use X because apart from BlueSky and Threads, which today

20  struggle to attract a critical mass of users as is required for social media companies to function, X

21  is a monopoly in the "short form public posting" social media company market. Moreover, users

22  typically use more than one social media platform, and use them all for different purposes, so

23  "social media platforms" is not the relevant market for analyzing X's monopoly position. Instead,

24  the market for an antitrust monopoly analysis here is the "short form public posting" social media

25  market.

26                    **RELEVANT NONPARTY**

27      22.    X.AI Corporation ("X.AI" or "X.AI Corp") is a company owned and operated by X

28  Corp with a principal place of business of 1450 Page Mill Rd, Palo Alto, CA 94304. On

1    information and belief, X Corp runs its AI Agents through X.AI Corp. As of December 23, 2024,

2    X.AI raised an additional $6 billion in a private funding round supported by Fidelity, BlackRock,

3    Sequoia Capital, among others, making its total funding to date over $12 billion.

4    **JURISDICTION AND VENUE**

5         23.     The Court has jurisdiction over all the causes of action alleged in this Complaint

6    pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000.00 and there

7    exists complete diversity between Plaintiffs and Defendant. Plaintiff Eliza Labs, Inc., a Delaware

8    corporation, has its principal place of business in San Francisco, California. Plaintiff Shaw

9    Walters resides and works in San Francisco, California, and is a California citizen. Defendant X

10   Corp is incorporated in Nevada with a principal place of business in Texas.

11        24.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§

12   1331 and 1337 because a claim arises under the laws of the United States, specifically 15 U.S.C. §

13   2 for Defendant's antitrust violations of the Section 2 of the Sherman Act.

14        25.     This Court has personal jurisdiction over X Corp because a substantial part of the

15   events giving rise to the allegations contained in this Complaint occurred in San Francisco, the

16   acts alleged in this Complaint were targeted at a corporation headquartered and operating in

17   California and a citizen of California, and X Corp purposely availed itself of the privilege of

18   conducting business in the State of California such that the claims advanced against it arise out of

19   X Corp's contact with Eliza Labs in the State of California, and thus the exercise of personal

20   jurisdiction is reasonable. X Corp also purposely availed itself of the laws of the State of

21   California by conducting business with, making fraudulent statements to, and unfairly competing

22   with a California corporation.

23   **VENUE**

24        26.     Venue is appropriate in this judicial district under 28 U.S.C. § 1391(b)(2) because

25   all the complained of activities herein were directed at San Francisco-based Eliza Labs and Shaw

26   Walters and took place in San Francisco, California.

27   **DIVISIONAL ASSIGNMENT**

28        27.     Pursuant to Civil L.R. 3-2(c), this case may be properly assigned to the San

Case No. 25-7243

Francisco (or, less preferably, Oakland) Division of the Northern District of California because a substantial part of the events or omissions giving rise to the claims herein occurred in the City and County of San Francisco, California.

## FACTUAL BACKGROUND

28.    This case arises against the backdrop of a rapidly developing industry: deploying artificial intelligence ('AI') tools on social media platforms. In this emerging market, access to platform data and real-time user interactions is essential for competitive success. There currently exists a race to make effective, reliable AI tools to run on social media platforms to allow marketing, customer engagement, branding, market analysis, and predictive directional steps to be performed autonomously, thereby maximizing user engagement and content sharing, meanwhile liberating time for individuals and companies to focus on other endeavors.

29.    For purposes of antitrust and unfair competition analysis, the relevant market here includes AI tools and agents deployed on large-scale social media platforms. X's platform is the dominant, and in many respects the only, viable venue for such tools because of its unparalleled real-time communication network and scale of user-generated data.

30.    The X platform and AI tools on the X platform are used in interstate commerce and the activities described herein have a substantial impact on interstate commerce.

## AI Agents

31.    AI Agents are computer programs that can act independently to complete tasks or achieve goals, similar to having a digital assistant that can think and take actions on its own. AI Agents are autonomous or semi-autonomous software programs that use artificial intelligence techniques to perceive their environment, make decisions, and take actions to achieve specific goals. AI Agents are in effect intelligent assistants or workers that can operate on their own (or with minimal guidance), often mimicking human decision-making processes.

## Plaintiffs' Open Source Software

32.    Plaintiffs are at the forefront of developing open source software to facilitate next-generation autonomous agent systems, or AI Agents, to operate on social media platforms. Eliza Labs has a host of open source software products available for download that allow individuals

1    and others to operate AI Agents on a variety of platforms.

2        33.    In the months after its founding, Eliza Labs successfully created several open

3    source product offerings that allowed its customers to build AI Agents. Eliza's open source

4    offerings quickly became popular, some of which operated on Twitter's application program

5    interface (API) so that users of Eliza's software could use these AI Agents to process and respond

6    to tweets on X.

7        34.    In or around late 2024 and throughout early 2025, at X's request, X Corp reached

8    out to Eliza Labs to engage Eliza in discussions about AI Agents running on X's platform. X had

9    received billions in investment for this type of AI research and development and, on information

10   and belief, was gathering information about how best to implement AI on X.

11       35.    Because Eliza's tools gained traction and demonstrated novel capabilities, X

12   initiated discussions directly with Eliza's founder, Shaw Walters, including in-person meetings at

13   X's offices. In these discussions, Walters shared extensive details about Eliza's architecture,

14   development roadmap, and vision for AI Agents.

15       36.    Here is a screenshot showing of one of X's emails (from X's AI researcher and

16   developer Evan Dolgow) to Shaw Walters where X represented that it was "[l]ooking forward to

17   advancing the AI Agent vision together."

18


19

20

21

22       37.    Over the course of numerous conversations, including in-person site visits to X's

23   offices, Mr. Walters and Eliza Labs provided extensive details about their AI Agents, including

24   where they saw need for new development, where they envisioned the future of AI Agents being,

25   and how they developed software tools to maximize AI utility and advancements in the space. Mr.

26   Walters and Eliza Labs believed they were collaborating with X to build an exciting new internet

27   where all people would be able to access and to utilize AI Agents to maximize utility, access to

28

1    high-caliber and reliable information, and efficiency.

2        38.    During these discussions, X asked for Shaw's opinion on the pricing and

3    availability of their developer license and higher tier "enterprise license". Shaw indicated in

4    person that if Eliza Labs were to make a commercial product in the future, Eliza Labs would

5    consider buying the license as needed. Suddenly, X began making reference to a new "Enterprise

6    License," stating that, to continue to operate on X, Eliza Labs must spend $50,000.00 per month

7    ($600,000.00 per year) to receive an Enterprise License from X. Here is a screenshot from X

8    demonstrative of this abrupt shift from engaging collaboratively on developing AI to demanding X

9    pay for an Enterprise License to continue its pre-existing operations:

10   Hi Shaw,

11   Hope you are well, reaching out regarding our API conversations. We ultimately value your passion for hacking and
     building the Eliza.os framework to enable agentic use cases on X. We recognize that some of Eliza's hacked functionality
     stems from DevPlatform limitations and have taken this feedback to our engineering team.

12   However, Eliza.os & Eliza.systems has raised significant flags with X Policy for API circumvention, unverified government

13   customers, and unapproved use cases. Legal was set to contact you directly but given our relationship, we've managed to
     pause that process for now.

14   Please understand that while we appreciate innovation, compliance with our guidelines is non-negotiable. We're open to
     discussing solutions, mainly Enterprise API access, that enable you to become compliant with X ToS.

15   Please let us know if you are free to chat Thurs/Fri this week or Mon/Tues of next week.

16   Best,
     Evan

17       39.    The above reads like extortion: "we assert that you have violated our rules, but if

18   you pay us money, we will look the other way."

19

20       40.    While this sum amounted to pennies to X, X knew, or should have known, that this

21   amount constituted an exorbitant sum to open-source software provider Eliza Labs, who was only

22   nascently raising capital to support its operations. X knew, or should have known, that Eliza, as a

23   small open-source startup, could not afford this fee and that imposing such a barrier was

24   tantamount to excluding Eliza from operating on X's platform.

25                    **X's Expensive Enterprise License Scheme**

26       41.    As is well documented in the media, after the Musk takeover of Twitter, advertisers

27   began fleeing the platform, resulting in revenue loss for X. These losses continued in response to

28   Musk's actions throughout 2024 and 2025.

22065696.10

42.    To generate revenue, X was forced to develop novel revenue streams, such as requiring users to pay for verified accounts, selling new types of for-pay accounts/licenses for operating on X, and charging users $10,000.00 to have a gold (or blue) checkmark appear by their account name.

43.    Still failing to stem losses, X developed additional tiers of accounts/licenses that users could purchase depending on their use cases of the X platform. X began charging according to distinct use-cases, differentiating between, for example, simply "tweeting" versus reposting others' tweets in real-time on an independent website. For the latter, X charged more, initially a few thousand a year, but increasing steadily so that, by the end of 2024, X's account/license fees were as much as $50,000.00 a year.

44.    On information and belief, X further appreciated that, because of the broad, unchallenged immunity the Courts awarded X under 47 USC § 230 ("Section 230"), X could wield the threat of deplatforming to induce acceptance of whatever license terms X dictated.

45.    On information and belief, X's licensing scheme was not designed to cover costs, but to leverage the existential threat of deplatforming to coerce developers into paying exorbitant sums.

46.    By way of example, if a user whose business depended on communicating and engaging through X's platform refused to pay X's demanded sum to maintain its existing license/account, then X would threaten deplatforming (or actually deplatform) the user. Believing filing suit to address X's "publishing decision" to deplatform futile, the user would accede to X's demands; what other choice did the user have if it needed access to the monopoly platform to operate its business.

47.    Following routine increases throughout 2025, to date, X's "pay-to-play" licensing scheme can cost a user as much as $210,000.00 *per month*, or **$2,520,000.00/year** to post, to view content, to use X user-generated data, and to otherwise operate on X. The expense of an account such as this effectively eliminates all individual users – and all but large corporate actors – from obtaining an Enterprise License to operate on X.

48.    This matters because, on information and belief, X now attempts to restrict the use

1  of AI Agents only to users with Enterprise Licenses. This is a new tactic for X. Users used to be

2  able to use AI Agents on X with only a Developers License, costing less than $15,000.00/year.

3       49.     On information and belief, X has now forced numerous users in the crypto and/or

4  AI space to accept Enterprise Licenses by threatening to deplatform them, or by in fact suspending

5  their accounts (deplatforming them) only to reinstate their accounts after adopting an Enterprise

6  License. This scheme had the effect of excluding smaller companies, open-source developers, and

7  startups from the market for AI Agents on X, reserving participation for only the wealthiest

8  corporations or X's own affiliated entities, such as X.AI.

9  **Non-Publishing Consequences of Deplatforming**

10       50.     The effects of deplatforming a user are not limited to restricting the publishing of

11  third-party content. This is critical because the Section 230 analysis employed by Courts to

12  evaluate immunity considers whether the action was a "publishing" decision affecting "third party

13  content." If the action extends significantly beyond content moderation, then Section 230

14  immunity should not apply.

15       51.     When deplatformed from X's social media platform, that user is affected far

16  beyond his ability to publish content. The user becomes unable to access his posting history,

17  unable to view any historical communications he had on the site, and unable to view new posts by

18  anyone (including the White House, thereby potentially missing vital news). This is far different

19  than a newspaper declining to publish an article, whereby the article's author may still read the

20  newspaper and access any of his communications with the newspaper's editors. Deplatforming a

21  user from X has far more extensive and serious consequences than simply restricting a user's

22  ability to publish content.

23       52.     Accordingly, X's decision to deplatform Eliza was not an editorial or publishing

24  judgment about third-party content, but a broader business decision that disabled Eliza's ability to

25  function, communicate, and compete in the marketplace. Deplatforming also cut-off access to

26  years of DMs with users, collaborators, and investors, which cannot be replicated elsewhere.

27  **X's Deplatforming of Plaintiffs**

28       53.     On or around June 10, 2025, X suspended developer accounts @ElizaOS and

@shawmakesmagic belonging respectively to Eliza Labs and Shaw Walters. Eliza Labs and Shaw Walters collectively pay $1,200/month for their accounts, and Eliza recently purchased the "gold tick" from X for $10,000.00.

54.    As explained *supra*, X's deplatforming of Eliza Labs occurred after months of meetings between X's Head of Data and API (Evan Dolgow) and Eliza Labs's Shaw Walters and after X demanded that Eliza Labs pay $50,000.00/month to continue to operate on X, which (X knew) Eliza Labs could not do and did not need to do to comply with X's terms and conditions.

55.    X then claimed that it deplatformed Eliza Labs and Mr. Walters because the accounts violated X's terms and conditions (they did not, and X knew they did not), but a series of communications throughout June, July, and August, 2025, between X and Eliza Labs renders this claim demonstrably false.

56.    At all times since their suspension, both accounts complied fully with X's terms and conditions, as demonstrated in numerous communications wherein Eliza Labs painstakingly explained its full and complete compliance. Throughout these communications, X never once identified any specific deficiencies in the accounts' compliance with X's terms and conditions. Eliza Labs, repeatedly, in exhaustive detail, demonstrated its full compliance with X's terms and conditions, responded fully and completely to every request from X for more information, documentation, and descriptions, and waited patiently for X to reactivate its accounts.

57.    Throughout June, July, and August, 2025, X used purported "cease and desist" communications to pump Eliza Labs for information about creating, developing, building, and deploying AI Agents. On information and belief, X held out the promise of account reinstatement to induce Plaintiffs to spill as much information and detail as possible about its operations on X, which Plaintiffs did, assuming that if X understood exactly what Eliza did and how, that X would reinstate Plaintiffs' accounts.

58.    For example, on June 13, 2025, after already providing additional details to X explaining that Eliza's operations on X were fully compliant with X's terms and conditions, X acknowledged Eliza's compliance, but nevertheless demanded that Eliza complete a use case questionnaire:

PLAINTIFFS' COMPLAINT FOR DAMAGES AND INJUNCTIVE AND DECLARATORY RELIEF

22065696.10

"Thank you for your email and good faith efforts to remediate the breaches explained in our June 10 letter.

"As immediate next steps, please (1) provide documents confirming all services accessing X Data have been permanently removed from your product and website; and (2) fill out the attached Data Licensing Use Case Questionnaire with as much detail as possible.

"Once these steps are taken, we will quickly evaluate your use case for access to our official Enterprise API. We look forward to a compliant and mutually beneficial partnership in the future."

59.     This use case questionnaire had specific asks around how Eliza accessed endpoints, workflows for ingesting data, and more implementation-specific details that represented a deep dive into Eliza's product offerings.

60.     Then, on June 30, 2025, X asked for direct access to Eliza's framework:

"Access to ElizaOS.ai's Framework for Investigation.

 "Please grant X access to ElizaOS.ai's framework, including API endpoints and data pipelines, to verify compliance with X's API Developer Policy and ToS."

 "Provide a detailed explanation of Eliza.Systems business model, system architecture, data flows, and storage practices[.]"

61.     Then on July 23, 2025, X made additional demands:

"Our internal teams have reviewed the material you sent and have requested the following: documentation showing all X endpoints ElizaOS previously publicized for DMs, post scraping, and all X functionality in general. ElizaOS had two products capable of scraping/hacking X -- a v1 & v2 release -- so please send documentation from both repositories for our team's review.

"Additionally, if ElizaOS could provide context on each endpoint explaining what they did and how, that would be helpful."

62.     All of these demands came from faceless, nameless "X Litigation Demands" or "X

1  Legal" or "Litigation" email addresses and email signatories. Despite repeat requests from Eliza

2  Labs and its own identified counsel, at no point has X provided the names. To date, despite

3  attempts to resolve this dispute before filing, X only communicates through

4  "litigation@twitter.com" or "legal@x.com" email addresses, and never with a named signatory to

5  any email, begging the question of whether licensed lawyers are involved at all.

6       63.    Although the Eliza Labs's code and software for its AI Agents are open source,

7  Eliza Labs and Shaw Walters possess considerable knowhow not reflected in the code. It is this

8  knowhow – the details of implementation, explanations surrounding functionality, and education

9  about which coding choices Plaintiffs made where and why – that X accessed throughout the cease

10  and desist process: a detailed, first-hand education from the coders themselves about how to

11  implement, operate, and optimize the open source software to make effective and seamless AI

12  Agents for users.

13       64.    At all times that X requested this detailed, specific information, X, and only X, new

14  that it was already developing its own AI Agents. Eliza was not aware that X was developing or

15  launching its own AI Agents. Eliza knew about Grok, but did not know about Ani, which X

16  launched immediately after starting these technical communications with Eliza.

17       65.    Despite Eliza Labs's good faith compliance with all X's demands, and despite

18  Eliza's complete, detailed, and onerous information sharing, X refused to reactivate Eliza Labs's

19  and Shaw Walters's accounts.

20       66.    As of this filing, X continues to hold the accounts hostage.

21             **X Launches New AI Agents That Are Nearly Identical to Those that**

22             **<u>Plaintiffs' Open Source Software Allows Users to Build</u>**

23       67.    While Plaintiffs' accounts remained suspended—and after Defendant elicited

24  highly detailed technical information from Plaintiffs under false pretenses—Defendant launched

25  its own AI Agents that mirror Eliza's offerings. Defendant's equivalent products were enabled by

26  Defendant's fraudulent inducement and exclusionary conduct, which deprived Plaintiffs of market

27  access while Defendant launched materially identical AI Agents. By launching these copycat

28  products while keeping Plaintiffs deplatformed, Defendant eliminated competition, ensured its

own products faced no rival on its platform, and positioned itself to monetize Plaintiffs'
innovations without incurring development costs, all possible because of X's monopoly position in
the short form public posts social media market.

68.    X's new offerings and Eliza's AI Agents perform the identical functions as follows:

| Feature/Functionality | ElizaOS (Plaintiffs) | X's AI (Defendant) |
|---|---|---|
| **3D Avatars** | ElizaOS avatars integrated with Character Studio, including 3D characters with voice, animation, and world integration. Entirely open source. | X.AI's avatars launched with identical 3D character, voice, and animation features. |
| **User Interaction on Platform** | ElizaOS hallmark feature: integration with X platform for real-time interactions. Powered major community projects (e.g., @elizawakesup). | X's "Grok" conversational chat and AI characters now perform the same interactive functions. |
| **Voice + Video Support** | ElizaOS plugins for real-time text-to-speech and avatar video feed. | X's new characters provide real-time speech and video integrations. |
| **Telephone Integration** | ElizaOS integrates with Twilio for calls/text via phone numbers. | X.AI's "Ani" and "Valentine" agents now use phone numbers for calls/text. |

69.    By way of illustration:

A.    **3D Avatars:**

ElizaOS avatars are integrated with Character Studio, created by Shaw and community
members. ElizaOS is fully integrated with 3D characters with voice, animation and even
3D world integration. All of this code is open source.

ElizaOS Avatars:

PLAINTIFFS' COMPLAINT FOR DAMAGES AND INJUNCTIVE AND DECLARATORY RELIEF

22065696.10





X.AI Avatars:



**B.      AI voice and video support:**

ElizaOS has plugins and integrations for real-time text-to-speech and avatar video feed:



X's new "characters" do the same:



**C.    Voice and text telephone integration:**

ElizaOS features call and text by phone number using Twilio integration:



X.AI's Ani and Valentine agents now have phone numbers to call:

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17



18

19

20

21

22

23

24

25



26    Eliza's initial commit of the newest version of our calling integration was on June 16,

27    2025; X released this functionality on August 16, 2025.

28        70.    Members of the developer and user community, including independent

commentators on X, immediately noted the striking similarities between ElizaOS and X's new 'characters' and publicly called out the overlap, as shown in the following examples:





PLAINTIFFS' COMPLAINT FOR DAMAGES AND INJUNCTIVE AND DECLARATORY RELIEF

22065696.10

71.     Ani, X's AI companion, launched on July 14, 2025. This was about a month after Eliza's ban on June 10, 2025. X's AI tool Grok added functionality on March 7, 2025, one month after Walters visited X's headquarters twice to provide details on how to build X AI Agents.

72.     Accordingly, on information and belief, not only did X pretextually accuse Eliza of violating X's terms and conditions when it did not, X fraudulently induced Eliza to rely on X's promises of account reinstatement to extract crucial information from Eliza, which X then parlayed to develop its own software that performed the same functions Eliza's performed, in the same manner, to achieve the same objective, meanwhile eclipsing any use of Eliza's AI Agents on X because Eliza remained deplatformed.

73.     On information and belief, Defendant finalized and launched these AI features only after extracting detailed implementation knowledge from Plaintiffs during the months when Plaintiffs' accounts were suspended and being 'reviewed.' Defendant's timeline for launch tracks precisely with the period during which Plaintiffs were repeatedly asked to provide seriatim technical explanations and documentation.

74.     On information and belief, Defendant never intended to reinstate Plaintiffs' accounts. Instead, the suspension was a calculated pretext to extract know-how, eliminate a competitor, and clear the field for Defendant's own product launch.

75.     X's actions were not only fraudulent, but also they are textbook anticompetitive acts intended to harm a competitor, to drive up prices for its own copied products, to stymie competition, and further to reduce free access to information posted on the internet.

76.     X's actions harmed, and continue to harm, Eliza Labs in many ways, including but not limited to depriving Eliza and Walters access to paid accounts, silencing Eliza and Walters's voices on a prominent social media platform, preventing Eliza from disseminating its products to users, interfering with Eliza's ability to raise capital or other funding, creating a knock-off copied version of Eliza's AI Agents and profiting off them, and ultimately excluding Eliza from the marketplace for AI Agents on X. X's fraudulent deplatforming has damaged Eliza's relationships with customers, harmed Eliza's reputation, and impeded (intentionally) Eliza's growth. X's actions also blocked Eliza's distribution channels, cutoff its ability to attract users and investors,

1    and deprived Eliza of a fair opportunity to compete.

2        77.    X benefited, and continues to benefit, from its anticompetitive and fraudulent acts.

3    X launched new AI Agents without incurring significant development costs because its agents are

4    mere copies of Eliza's AI Agents, and X hoodwinked Eliza into educating X about how to create,

5    implement, and optimize these AI Agents to operate most effectively on X's platform. Further, X

6    launched its AI Agents into a competition-free marketplace because, at all times during the launch,

7    Eliza Labs remained deplatformed. Through these actions, X unjustly enriched itself in an amount

8    to be proven at trial well exceeding $75,000.00 given the 12 billion in investments X.AI received

9    in anticipation of the significance of such AI Agents operating on X's platform with X's data.

10   Defendant's enrichment is measurable not only by avoided development costs but also by the

11   billions in valuation and investment secured for X.AI, which were predicated in part on

12   innovations that Defendant misappropriated from Eliza.

13       78.    Additionally, the reputational harm to Eliza Labs and its founder Shaw cannot be

14   overstated. Prior to the abrupt and unannounced deplatforming, Walters had roughly 156,000

15   followers and Eliza had roughly 150,000 followers. These followers were left without any

16   understanding or explanation of why Eliza and Walters suddenly disappeared. Disappearing

17   without notice or explanation makes it appear as if Eliza ceased doing business altogether, was an

18   unreliable company, did not care about its customers, was a failing company, or had done

19   something wrong, when none of these things is true and each of them harms Plaintiffs' reputations

20   significantly.

21       79.    This reputational harm has forever affected Eliza's ability to attract funding. Eliza

22   is – or was – actively engaging with venture capital funding source and in the process of securing

23   additional funds. X's actions hurt, seriously, Eliza's ability to raise capital or to receive funding.

24       80.    In addition, many consumers and builders were left without viable sources of

25   information about the project and framework developments since X was Eliza's place of update

26   distribution about its business activities, as X knew (or should have known).

27       81.    The unexplained disappearance of Plaintiffs' accounts left Plaintiffs' followers and

28   customers to guess about what happened to Plaintiffs, such as is represented in these examples of

speculation and commentary later posted on X:



Case No. 25-7243

PLAINTIFFS' COMPLAINT FOR DAMAGES AND INJUNCTIVE AND DECLARATORY RELIEF

1

2

3

4

5

6

7

8



**Tom K Sebastian** @TomKSebastian4 · Aug 7
In the last few days I saw a lot of real projects powdered by elizaos. Bro meanwhile any update on X. You said one more last week

💬 1              ↻              ♡ 1              📊 78              🔖 ⬆️

**🟥MaSk**
@Mark_Ska76

Disappointing that @ElizaOS and @shawmakesmagic are not able or willing to reactivate X or any other channels of communication 🙁

10:57 PM · Aug 7, 2025 · **68** Views

9       82.      Furthermore, X now blocks anyone – not just Plaintiffs – from posting links to

10    Plaintiffs' GitHub, which is where customers go to download Plaintiffs' AI software building

11    tools. In other words, X does not allow any links to Plaintiffs' products on X, regardless of who

12    posts the links. X entirely prohibits any links to any of Plaintiffs' products appearing anywhere on

13    X's platform.

14              **Section 230 Does Not Immunize X for Anticompetitive and/or Fraudulent Acts**

15      83.      While social media providers such as X enjoy immunity for decisions to publish (or

16    to delete) third party content, this immunity is limited by the plain language of 47 USC Section

17    230 to "'Good Samaritan' blocking and screening of offensive material" to achieve the expressly

18    stated policy objectives of, *inter alia*:

19                    "promot[ing] the continued development of the Internet and other
                       interactive computer services and other interactive media;
20

21                    "preserv[ing] the vibrant and competitive free market that
                       presently exists for the Internet and other interactive computer
22                     services, unfettered by Federal or State regulation; [and]

23

24                    "encourage[ing] the development of technologies which maximize
                       user control over what information is received by individuals,
25                     families, and schools who use the Internet and other interactive
                       computer services[.]"
26

27    *See* 47 USC § 230 (b), "Policy."

28      84.      X's actions here of deplatforming AI Agent competitor Eliza (1) to extract details

23                                                          Case No. 25-7243

1  regarding the use, implementation, and development of Eliza's AI Agents on X and (2) to achieve

2  a competitive advantage of marketing, without competition, an equivalent (nearly identical) AI

3  Agent emphatically fly in the face Section 230's stated rationales for conferring immunity to

4  entities such as X.

5      85.    Moreover, X's actions are not publishing decisions at all; they are calculated and

6  cunning business decisions designed to destroy competition, erode a vibrant and competitive free

7  market, extract money and information from competitors, and stifle the continued development of

8  the internet so that the spoils of innovation remain concentrated in the hands of an elite few who

9  already control information flows.

10     86.    X's acts here are the antithesis of those Congress sought to protect by instituting

11  Section 230 according to the plain language of the statute itself. X cannot – and must not – be

12  immune for deplatforming users to extract money and/or information or to prevent competition.

13     **X's Musk Recognizes Tech Giants' Ability to Manipulate AI Markets**

14     87.    Eliza's claims regarding a tech giant using anticompetitive and fraudulent conduct

15  to further the company's burgeoning AI department or sister-company is not a novel ideal to X.

16     88.    For many of these tech giants, the companies both generate the data and then seek

17  to deploy, to control, and to monetize the AI tools that depend on the generated data. This is a

18  novel area fertile for anticompetitive behavior, namely allowing vertically integrated monopolies

19  whereby an existing monopoly (the data generator) may secure the monopoly position of the

20  another monopoly (the AI data consumer) through a variety of unlawful means, most of which

21  occur behind the scenes where end-users remain unaware of the conduct or where the companies

22  claim to be afforded governmental protection for their actions (for example, Section 230 immunity

23  to deplatform any and all AI competitors from X).

24     89.    Indeed, on August 11, 2025, X's Musk accused another tech giant of doing

25  precisely this – using its monopoly power in one market to bolster sales of its vertically integrated

26  AI company and products:

27

28

PLAINTIFFS' COMPLAINT FOR DAMAGES AND INJUNCTIVE AND DECLARATORY RELIEF

22065696.10

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Sam Altman** ✔  @sama · 16h

This is a remarkable claim given what I have heard alleged that Elon does to manipulate X to benefit himself and his own companies and harm his competitors and people he doesn't like.

> 🔵 **Elon Musk** ✔ ✖ @elonmusk · 17h
>
> Apple is behaving in a manner that makes it impossible for any AI company besides OpenAI to reach #1 in the App Store, which is an unequivocal antitrust violation.
>
> xAI will take immediate legal action.
>
> ---
>
> 👥 **Readers added context**
>
> In January 2025, DeepSeek reached #1 overall on the App Store.
> abcnews.go.com/Business/deeps...
>
> Just one month ago, on July 18, 2025, Perplexity also reached #1 overall in India's App Store.
> hindustantimes.com/technology/air...
>
> Both of these occurred after the OpenAI–Apple partnership announced on June 10, 2024.
> openai.com/index/openai-a...
>
> Do you find this helpful?                          **Rate it**

💬 3.6K        ⟲ 4.7K        ♡ 49K        ᪲ 8M        🔖  ⬆️

Case No. 25-7243

22065696.10
PLAINTIFFS' COMPLAINT FOR DAMAGES AND INJUNCTIVE AND DECLARATORY RELIEF

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



Case No. 25-7243

PLAINTIFFS' COMPLAINT FOR DAMAGES AND INJUNCTIVE AND DECLARATORY RELIEF

1

**FIRST CLAIM**

2

**(Intentional Misrepresentation)**

3      90.    Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth and

4    incorporated herein.

5      91.    Defendant X made knowingly false representations to Eliza Corp that it would

6    reinstate and/or not deactivate Plaintiffs' accounts if Plaintiffs shared knowhow and

7    implementation specifics about its AI Agents with X.

8      92.    At the time X made these representations, it knew they were false (or made the

9    representations recklessly without regard for their truth) because X never intended to reinstate or

10    reactivate Plaintiffs accounts, but rather sought to extract as much detailed information as possible

11    from Plaintiffs so X could create its own AI Agents copying Plaintiffs' AI Agents while

12    eliminating Plaintiffs as competition with deplatforming.

13      93.    Defendant intended that Plaintiffs rely on its representations that if Eliza provided

14    sufficient documentation, X would reinstate Plaintiffs' account.

15      94.    Plaintiffs reasonably relied on Defendant's representations.

16      95.    Plaintiffs reliance was a substantial factor in causing Plaintiffs the harm of allowing

17    X to launch its AI Agents on X while Plaintiffs' AI Agents remained dormant awaiting account

18    reactivation, which hindered Plaintiffs' ability to attract and retain customers, obtain followers,

19    communicate with followers, conduct business, and receive funding, and allowed X to benefit

20    from its AI Agent becoming the adopted standard instead of Eliza's AI Agent, and further harmed

21    Plaintiffs and unjustly enriched Defendant as will be discovered and proven.

22      96.    Because X committed the above acts and omissions maliciously, wantonly, and

23    oppressively, Plaintiffs are entitled to punitive damages.

24

**SECOND CLAIM**

25

**(Concealment)**

26      97.    Plaintiffs repeat and reallege the foregoing paragraphs as if fully set and

27    incorporated herein.

28      98.    Defendant intentionally failed to disclose that, no matter what Plaintiffs did, shared,

22065696.10

1   explained, or did not do, Defendant would be deplatforming and/or not reactivating Plaintiffs' X

2   accounts, and Plaintiffs could not have reasonably discovered this because such knowledge and

3   information, including the fact that Defendant intended to launch a product competing with

4   Plaintiffs', is within X's purview and knowledge only.

5        99.    X intended to deceive Plaintiffs by concealing the facts that it always planned to

6   deplatform Plaintiffs and would never, no matter how much information Plaintiffs shared,

7   reactivate Plaintiffs' accounts or not deplatform Plaintiffs.

8        100.   Had X explained that (1) it deplatformed Plaintiffs because it sought to launch a

9   product to compete with Plaintiffs' and it did not want Plaintiffs' free product to affect X's

10  product's success (2) it sought to engage Plaintiffs to explain Plaintiffs' AI Agent so that X could

11  effectively recreate the equivalent product or, at a minimum, be certain Plaintiffs' product did not

12  have functionality that Defendant's product lacked and (3) Defendant always intended to

13  deplatform Plaintiffs because Plaintiffs were a competitor and provided open source software that

14  enabled direct competition with X's AI Agents, Plaintiffs would have behaved differently.

15       101.   Defendant's concealment was a substantial factor in causing harm to Plaintiffs.

16       102.   Plaintiffs were damaged insofar as they waited months complying with X's

17  informational demands and awaiting platform access, sharing information and knowhow they

18  would not otherwise have provided to X. During this time, Plaintiffs could not communicate with

19  customers, community members, funders, and potential investors, nor were Plaintiffs involved in

20  seeking new communication avenues because they believed X was acting in good faith and would

21  eventually reinstate their accounts. Plaintiffs were also damaged by X's launching an equivalent

22  AI Agent that was able, and continues to be able, to attract customers and use without any

23  competition from Plaintiffs' AI software products, which are deactivated because of Plaintiffs'

24  deplatforming and because X's ongoing ban to posting links to Plaintiffs' products. Defendant was

25  unjustly enriched by copying Plaintiffs' AI Agent, rebranding and launching the equivalent AI

26  Agent based on Plaintiffs' knowhow, and eliminating Plaintiffs' competition for AI Agents in an

27  amount to be proven at trial.

28       103.   Because X committed the above acts and omissions maliciously, wantonly, and

1    oppressively, Plaintiffs' are entitled to punitive damages.

2    **THIRD CLAIM**

3    **(False Promise)**

4       104.    Plaintiffs repeat and reallege the foregoing paragraphs as if fully set and

5    incorporated herein.

6       105.    X promised Plaintiffs that if they demonstrated that they were in full compliance

7    with X's terms and conditions (Plaintiffs were) and provided additional details explaining

8    Plaintiffs' full compliance, X would reactivate Plaintiffs' accounts.

9       106.    X never intended to reinstate Plaintiffs' accounts and instead intended to extract as

10    much information from Plaintiffs about AI Agents as possible while delaying and distracting

11    Plaintiffs so X could launch a competing product.

12       107.    X intended that Plaintiffs rely on X's promise that it would reactivate Plaintiffs'

13    accounts if Plaintiffs provided all the detailed information X requested.

14       108.    Plaintiffs reasonably relied on X's promise.

15       109.    X failed to perform its promise and, despite Plaintiffs' full compliance with all of

16    X's terms and conditions and requests for information, never reactivated Plaintiffs' accounts.

17       110.    Plaintiffs' reliance on Defendant's promise of account reactivations for several

18    months while Plaintiffs provided X more and more operational details was a substantial factor in

19    causing harm to Plaintiffs.

20       111.    Plaintiffs were harmed by losing access to customers and supporters, having X

21    supplant Plaintiffs' AI Agent with X's own AI Agent, providing technical know-how and detailed

22    operations assistance to X to enable X to build a competing product, lost time waiting for account

23    reactivations, damage to reputation for being deplatformed for false accusations of terms and

24    conditions violations, and other damages and harm that will be proven at trial, including

25    Defendant's unjust enrichment by copying Eliza's AI Agents and deploying the copies without

26    competition from Plaintiffs.

27       112.    Because X committed the above acts maliciously, wantonly, and oppressively,

28    Plaintiffs are entitled to punitive damages.

# FOURTH CLAIM

## (Cal. Bus. & Prof. Code § 17200)

113.    Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth and incorporated herein.

114.    Defendant has engaged in business activities that constitute unlawful, unfair, and fraudulent business practices within the meaning of California Business and Professions Code § 17200, et seq. ("UCL").

115.    Defendant's conduct is unfair under the UCL because it provides an unfair competitive advantage over Plaintiffs. Plaintiffs lawfully operated on X's platform and, solely because Plaintiffs' AI Agents competed with X's new AI Agents, Defendant deplatformed Plaintiffs thereby impeding Plaintiffs' ability to operate its AI Agents on X's platform, harming Plaintiffs. This conduct is contrary to public policy and undermines consumer protections to be free from anticompetitive actors abusing their monopoly positions to reduce competition and increase consumer costs.

116.    Defendant's representations that Plaintiffs could operate on X's platform if in full compliance with X's terms and conditions were false or misleading, as were Defendant's representations that, if Plaintiffs provided additional details about the operations of their AI Agents, X would either not deplatform Plaintiffs or would reactivate Plaintiffs' accounts. Such misrepresentations were likely to deceive Plaintiffs. Plaintiffs relied on Defendant's representations and would not have provided additional information to Defendant had Plaintiffs known that Defendant would either deplatform or refuse to reactivate Plaintiffs' accounts or that Defendant would be launching a competing AI Agent that copied Plaintiffs' preexisting AI Agent.

117.    As a direct and proximate result of Defendant's acts and omissions, Plaintiffs suffered injury in fact and lost money or property. Specifically, Plaintiffs paid for license fees and the gold check mark for accounts it cannot use, lost customer contact, cannot launch its AI Agent products, which it spent considerable time, money and energy developing, lost customers to X, lost funding and influence opportunities, and lost the chance to build its brand and further disseminate their AI Agents and proposed novel AI applications. Defendant was also unjustly

1    enriched by creating a product that copied Plaintiffs' existing product using Plaintiffs' knowhow

2    and detailed implementation explanations and marketing and selling that product to customers free

3    of competition from Plaintiffs. Defendant was also unjustly enriched by avoiding development

4    costs for its AI Agents.

5        118.    Pursuant to Business and Professions Code §§ 17203 and 17204, Plaintiffs seek

6    restitution, disgorgement of ill-gotten gains, and injunctive relief prohibiting Defendant from

7    continuing the unlawful, unfair, and fraudulent practices described herein.

8    **FIFTH CLAIM**

9    **(Unjust Enrichment)**

10        119.    Plaintiffs repeat and reallege the foregoing paragraphs as if fully set and

11    incorporated herein.

12        120.    Beginning in 2024, X began to pump Plaintiffs for information about developing

13    and creating AI Agents and other AI projects on X.

14        121.    On or around this time, X received billions in investment funding for AI projects.

15        122.    Instead of paying Plaintiffs for their detailed analysis, and instead of allowing

16    Plaintiffs to operate in full compliance with X's terms and conditions on X's platform, X extracted

17    critical AI information and details from Plaintiffs, built a product to compete with ElizaOS,

18    deplatformed Plaintiffs, continued to push Plaintiffs for implementation details on AI Agents, and

19    finally launched a product that competed with Plaintiffs AI Agents, meanwhile eliminating all

20    competition from Plaintiffs by deplatforming them.

21        123.    By extracting this information and knowhow from Plaintiffs, which X did

22    fraudulently by obtaining it in exchange for false promises of collaboration in the AI space and/or

23    account reactivation, and by avoiding expending for software development costs, X was unjustly

24    enriched at the expense of Plaintiffs.

25        124.    X knowingly received and benefitted from deplatforming Plaintiffs which enabled

26    them to unjustly obtain knowhow, information and details. This in turn allowed X to launch a

27    competitor product, without development costs, and for which such product, information, and

28    market share is rightfully Plaintiffs'.

22065696.10    PLAINTIFFS' COMPLAINT FOR DAMAGES AND INJUNCTIVE AND DECLARATORY RELIEF

125. There is no justification for X's conduct.

126. As a direct and proximate result of X's unjust enrichment, Plaintiffs have suffered and continue to suffer damages.

**SIXTH CLAIM**

**(Violation of Section 2 of the Sherman Act, 15 USC § 2)**

127. Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth and incorporated herein.

128. Plaintiffs' and Defendant's AI offerings have occurred in and have a substantial effect on interstate commerce.

129. Defendant has engaged in business activities that constitute unlawful monopolistic behavior in restraint of competition within the meaning of Section 2 of the Sherman Act, 15 USC § 2.

130. Defendant willfully acquired and/or maintained monopoly power in the relevant market through anticompetitive conduct, including but not limited to exclusive dealing, refusals to deal with competitors, refusing to share essential facilities with competitors, tying arrangements with X.AI, using a dominant position in one market to gain an uncompetitive advantage in another, and/or vertical foreclosure.

131. As a direct and proximate result of Defendant's unlawful conduct, Plaintiffs have suffered injury to business and property, including but not limited to lost sales, reduced fundraising capabilities, reduced access to capital and investments, reduced client communication and contact, impeded market access, and diminished competitive opportunities, harm to reputation, harm to products, other harm identified and alleged herein, and additional ongoing harm to be determined.

132. Plaintiffs' injuries flow directly from the anticompetitive effects of Defendant's monopolistic conduct and is of the type that the antitrust laws are designed to prevent.

133. Defendant has violated Section 2 of the Sherman Act, 15 U.S.C. § 2, by willfully acquiring and/or maintaining monopoly power in the relevant market through exclusionary and anticompetitive conduct including, but not limited to, through exclusive dealing, refusals to deal

1  with competitors, refusing to share essential facilities with competitors, tying arrangements with

2  X.AI, using a dominant position in one market to gain an uncompetitive advantage in another,

3  and/or vertical foreclosure.

4         134.    Defendant X's conduct has not been the result of superior product, business

5  acumen, or historic accident, but rather of deliberate exclusionary practices designed to suppress

6  competition and maintain monopoly power.

7         135.    Plaintiffs have been injured in its business and property as a result of Defendant's

8  unlawful conduct.

9                              **<u>PRAYER FOR RELIEF</u>**

10        Plaintiffs respectfully request that the Court enter judgment in Plaintiffs' favor and against

11  Defendant X on all counts and order as follows:

12        A.      Declare that X is not immune under 47 USC § 230 for its deplatforming of

13  Plaintiffs;

14        B.      Enjoin X from deplatforming Plaintiffs;

15        C.      Enjoin X from demanding Plaintiffs pay additional sums to operate under its

16  existing developer accounts;

17        D.      Enjoin X from blocking on X any links to Plaintiffs' GitHub or Plaintiffs' website;

18        E.      Enjoin X from blocking on X any links to any website advertising, marketing,

19  discussing, promoting, and/or allowing the download of Plaintiffs' AI software;

20        F.      Order X to restore all Plaintiffs' account access;

21        G.      Order X to disgorge to Plaintiffs all funds unjustly obtained from its unlawful,

22  anticompetitive, fraudulent, and wrongful conduct;

23        H.      Order X to compensate Eliza Labs for all the harm incurred as a result of X's

24  fraudulent actions;

25        I.      Order X to compensate Eliza Labs for all the harm incurred as a result of X's unfair

26  competition;

27        J.      Declare that Defendant violated Section 2 of the Sherman Act;

28        K.      Award treble damages pursuant to 15 U.S.C. § 15;

1    L.    Enjoin X to prevent further anticompetitive conduct under 15 U.S.C. § 26;

2    M.    For an award of costs of suit, including reasonable attorneys' fees;

3    N.    For punitive damages in an amount to be determined at trial;

4    O.    For interest on all sums to the fullest extent of the law;

5    P.    For such other and further relief as the Court deems just and proper under the

6    circumstances.

7    **<u>DEMAND FOR JURY TRIAL</u>**

8    Plaintiffs demand a trial by jury on each of its causes of action that are triable before a

9    jury.

10
11    DATED:  August 27, 2025                    HANSON BRIDGETT LLP

12

13                                        By:    */s/Matthew F. Miller*
14                                                MATTHEW F. MILLER
                                                  BATYA F. FORSYTH
15                                                SUSANNA L. CHENETTE
                                                  Attorneys for Plaintiffs ELIZA LABS, INC. and
16                                                SHAW WALTERS

17

18

19

20

21

22

23

24

25

26

27

28

22065696.10          PLAINTIFFS' COMPLAINT FOR DAMAGES AND INJUNCTIVE AND DECLARATORY RELIEF