HANSON BRIDGETT LLP
MATTHEW F. MILLER, SBN 172661
mmiller@hansonbridgett.com
BATYA F. FORSYTH, SBN 192346
bforsyth@hansonbridgett.com
SUSANNA L. CHENETTE SBN 257914
schenette@hansonbridgett.com
425 Market Street, 26th Floor
San Francisco, California 94105
Telephone:     (415) 777-3200
Facsimile:     (415) 541-9366

***Attorneys for Plaintiffs***
ELIZA LABS, INC. and
SHAW WALTERS

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| ELIZA LABS, INC., a corporation, and SHAW WALTERS, an individual,<br><br>Plaintiffs,<br><br>v.<br><br>X CORP. (fka TWITTER), a corporation, X.AI CORP., a Nevada corporation, and X.AI LLC, a Nevada limited liability company,<br><br>Defendants. | Case No. 3:25-cv-07243-AMO<br><br>**PLAINTIFFS ELIZA LABS, INC. AND SHAW WALTERS'S AMENDED COMPLAINT FOR INTENTIONAL MISREPRESENTATION, FALSE PROMISES, CONCEALMENT, AND VIOLATIONS OF CAL. BUS. & PROF. CODE § 17200 AND § 16700 (THE CARTWRIGHT ACT) AND SECTIONS 1 AND 2 OF THE SHERMAN ACT, AND REQUEST FOR DAMAGES, TREBLE DAMAGES, ATTORNEY'S FEES, AND INJUNCTIVE AND DECLARATORY RELIEF**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Eliza Labs ("Eliza," or "Eliza Labs") and Shaw Walters ("Walters") (collectively, "Plaintiffs"), for their Complaint against Defendants X Corp. ("X," "X Corp," or "Twitter"), X.AI Corp., and X.AI LLC ("X.AI") allege as follows:

## <u>NATURE OF THE ACTION</u>

1.      This case involves X Corp wielding its monopoly power with perceived immunity from suit to deplatform users with the intent to restrain competition for launching AI Agents on

1    the X Corp platform (Twitter).

2         2.     Perhaps considering itself immune for all deplatforming decisions regardless of

3    effect and intent (it is not), X used this perceived shield as a sword to thwart unwelcome

4    competition, to extract valuable information, and to achieve a competitive business advantage by

5    copying, and then banishing, one of the first successful developers of novel artificial intelligence

6    products to run on X's platform so that X.AI's follow-on copycat AI products could fill X's self-

7    created void.

8         3.     Such conduct epitomizes exclusionary and predatory practices that federal and

9    California law prohibit: leveraging monopoly control of an essential communications platform to

10   suppress competition from innovative new entrants.

11        4.     On the wrong side of X's distortive deplatforming are Plaintiffs—software

12   developer Eliza Labs and its founder Shaw Walters—operating with the laudable intent to

13   democratize access to artificial intelligence tools and crypto currency strategies so that the average

14   person may compete with the tech giants in using these sophisticated, lucrative, and novel

15   technologies. Plaintiffs were among the first, and perhaps most successful, software developers to

16   create open source software to enable others to build artificial intelligence agents ("AI Agents"

17   used interchangeably with "Generative AI Chatbots" herein) to operate on X's platform.

18        5.     Initially, X stoked Plaintiffs' development and passion for democratizing AI by

19   hosting Eliza's founder Walters for meetings at X's offices, working closely with Eliza's

20   developers to understand exactly how Eliza's approach and coding worked, and troubleshooting

21   future developments, concerns, and possibilities for the use of autonomous AI software—aka AI

22   Agents—on X.

23        6.     Plaintiffs engaged with X in good faith during this process, genuinely believing

24   they were collaborating to create exciting AI advancements in data processing. Then one day,

25   without notice, Plaintiffs could not log into their X accounts.

26        7.     Without warning or legitimate justification, X permanently suspended the accounts

27   of both Eliza Labs and its founder, Shaw Walters.

28        8.     In the weeks leading to the deplatforming, X began to push Plaintiffs to adopt X's

22175305.4
PLAINTIFFS' AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE AND DECLARATORY RELIEF

exorbitantly expensive product: the "Enterprise License" or "Enterprise API" (for $50,000.00/month, or $600,000.00/year). Plaintiffs, however, did not need a different license to operate on X: Eliza's existing $1,000/month Developer License, Walters's the $200/month developer account, and Eliza's $10,000.00 "gold check" authentication covered all of Plaintiffs' existing and planned activities on X's platform. Plaintiffs did not need to pay more for their existing, authorized use. As long as Plaintiffs could access their developer accounts, they had all they needed to build and to market their AI tools.

9.     On information and belief, X's demand for an Enterprise API was a pretextual barrier intended to exclude Plaintiffs from building tools to operate on X's platform and from accessing X's data and user prompts. X recently realized that its vast amounts of data were immensely valuable to AI developers, and X's new pricing for its Enterprise API is a scheme either to profit off AI developers who need X's data and user prompts to build AI Agents on X or to exclude all competitors from building AI Agents to compete with X.AI's Grok, which X integrated fully into X's API (every X account has Grok for free).

10.     Shortly after rejecting X's unnecessary and unconscionable $600,000.00/year license proposal, Plaintiffs found themselves unable to access X at all: X deplatformed Eliza and its founder Walters, completely, for no justifiable reason.

11.     In addition to deplatforming Eliza and Walters, X also blocked Eliza's website and its Github. No user anywhere could post links to Eliza's website or its Github.

12.     Now obvious in retrospect, X's actions vis-à-vis Plaintiffs constituted a coordinated, fraudulent, and anticompetitive effort to extract critical information from Plaintiffs regarding their open source software and development process. X sought to bring X.AI's own AI Agents to life on X, while barring Plaintiffs, *so that X and X.AI would not face competition from Plaintiffs' opensource activities.*

13.     This has now happened. X and X.AI launched nearly identical AI Agents—aka generative AI chatbots— on X's platform while Plaintiffs remain deplatformed and while continuing to pump Plaintiffs for precise technical details and knowhow about its AI Agents under the guise of evaluating whether to reinstate Plaintiffs' X accounts.

14. X's conduct not only constitutes fraudulent misrepresentation, concealment, and false promises, but also is textbook anticompetitive conduct. X summarily deplatformed its competitor Eliza clearing the way for its and X.AI's copycat product Ani that launched as a Grok companion shortly after Plaintiffs' suspension. X then delayed, throttled, and impermissibly inspected its competitor Eliza's product under the false pretenses of evaluating Plaintiffs for compliance purposes and false promises of reactivation. X also blocks links to Eliza's website and Github, regardless of who posts them.

15. This Complaint seeks to redress X's unfair competition, unlawful use of monopoly power in the Microblogging Social Media Platforms Market, unlawful tying of X's platform and X.AI's Grok, and fraudulent misrepresentations by obtaining immediate account reinstatement for Plaintiffs and by making Plaintiffs whole in the amount of X and X.AI's unjust enrichment from copying and supplanting Eliza's product, and Eliza's lost funding due to X and X.AI's monopolistic deplatforming actions and interference with customer and follower relationships.

16. For its anticompetitive and exploitative business decision to deplatform Plaintiffs, the X Entities are not above the law and not entitled to immunity. Such immunity exists only for publishing decisions that foster competition and support the free development of the internet. *See* 47 USC § 230(b). It does not exist to protect the anticompetitive business decisions of a monopoly microblogging social media platform abusing its position of power for profit.

17. By exposing the X Entities' unlawful wielding of deplatforming to achieve business objectives, and by obtaining reinstatement and disgorgement of their ill-gotten gains, Plaintiffs realize the policies of Section 230 "to promote the continued development of the Internet … to preserve the vibrant and competitive free market that presently exists for the Internet … [and] to encourage the development of technologies which maximize user control over what information is received … [from] the Internet." 47 USC § 230(b).

**PARTIES**

18. Plaintiff Eliza Labs, Inc. is a Delaware corporation headquartered in San Francisco, California, with a principal place of business of 2 Embarcadero Center, Floor 8, San Francisco, CA 94111. Founded in 2024, Eliza Labs is the creator of the Eliza agent framework, an open-

PLAINTIFFS' AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE AND DECLARATORY RELIEF

1  source platform designed to revolutionize the way autonomous AI agents are created, deployed,

2  and managed. The Eliza framework enables powerful multi-agent simulations, empowering

3  developers, researchers, and businesses to build advanced AI systems. Eliza Labs is committed to

4  pushing the boundaries of AI technology to shape the future of intelligent, autonomous systems.

5        19.    Plaintiff Shaw Walters, an individual working and residing in San Francisco,

6  California, is a California citizen and the founder of Eliza Labs. With a robust background in

7  artificial intelligence and machine learning, Mr. Walters champions an open-source and

8  transparent approach to AI and developing innovative new publicly available and free software

9  plugins and tools that democratize access to the internet's vast troves of data so that all—

10  individuals and small and large corporations alike—may participate in data aggregation,

11  compiling, processing, sorting, responding, and predicting equally.

12        20.    Defendant X Corporation (pka "Twitter, Inc.") (referred to interchangeably herein

13  as "X," "X Corp," "Twitter," and/or "Defendant") is a Nevada corporation with a principal place

14  of business of 865 FM 1209, Building 1, Bastrop, TX 78602. X Corp. owns and operates the

15  social media platform X (formerly known as Twitter), accessible through X.com, twitter.com, and

16  various mobile applications. X Corp. merged with Twitter, Inc. in April 2023, and was acquired

17  by X.AI Holdings Corp. in March 2025. X Corp. is a wholly owned subsidiary of X.AI Corp.

18  Throughout this Complaint, "X" is used interchangeably to refer either to the company or to the

19  social media platform depending on context.

20        21.    Defendant X.AI LLC ("X.AI") is a Nevada limited liability company and wholly

21  owned subsidiary of X.AI Corp., with a place of business of 1450 Page Mill Rd, Palo Alto, CA

22  94304. Its ultimate parent company is X.AI Holdings Corp. a principal place of. On information

23  and belief, X Corp runs its AI Agents through X.AI LLC.

24        22.    X.AI Corp. is a Nevada corporation with its principal place of business located in

25  Palo Alto, California. X.AI Corp.'s subsidiaries include, *inter alia*, X Corp. and X.AI LLC. On

26  information and belief, as of December 23, 2024, X.AI Corp. and/or X.AI LLC raised an

27  additional $6 billion in a private funding round supported by Fidelity, BlackRock, Sequoia

28  Capital, among others, making its total funding to date over $12 billion.

1    23.    Collectively, X Corp., X.AI LLC, and X.AI Corp. are referred to herein as the "X

2    Entities." Collectively, X.AI LLC and X.AI Corp. are referred to herein as the "X.AI Entities."

3    Collectively, X Corp. and X.AI LLC are referred to herein as the "X Subsidiaries."

4    **JURISDICTION AND VENUE**

5    24.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§

6    1331 and 1337 because a claim arises under the laws of the United States, specifically 15 U.S.C.

7    §§ 1 and 2 for Defendant's antitrust violations of Sections 1 and 2 of the Sherman Act.

8    25.    This Court has personal jurisdiction over X Corp because a substantial part of the

9    events giving rise to the allegations contained in this Complaint occurred in San Francisco, the

10    acts alleged in this Complaint were targeted at a corporation headquartered and operating in

11    California and a citizen of California, and X Corp purposely availed itself of the privilege of

12    conducting business in the State of California such that the claims advanced against it arise out of

13    X Corp's contact with Eliza Labs in the State of California, and thus the exercise of personal

14    jurisdiction is reasonable. X Corp also purposely availed itself of the laws of the State of

15    California by conducting business with, making fraudulent statements to, and unfairly competing

16    with a California corporation.

17    26.    This Court has personal jurisdiction over X.AI LLC its principal place of business

18    is Palo Alto, California. Additionally a substantial part of the events giving rise to the allegations

19    contained in this Complaint occurred in California, the acts alleged in this Complaint relate to a

20    corporation headquartered and operating in California and a citizen of California, and X.AI LLC

21    purposely availed itself of the privilege of conducting business in the State of California such that

22    the claims advanced against it arise out of X.AI LLC's conduct within the State of California,

23    making the exercise of personal jurisdiction reasonable.

24    27.    This Court has personal jurisdiction over X.AI Corp. its principal place of business

25    is Palo Alto, California. Additionally a substantial part of the events giving rise to the allegations

26    contained in this Complaint occurred in California, the acts alleged in this Complaint relate to a

27    corporation headquartered and operating in California and a citizen of California, and X.AI LLC

28    purposely availed itself of the privilege of conducting business in the State of California such that

22175305.4
PLAINTIFFS' AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE AND DECLARATORY RELIEF

1  the claims advanced against it arise out of X.AI LLC's conduct within the State of California,

2  making the exercise of personal jurisdiction reasonable.

## VENUE

4  28.    Venue is appropriate in this judicial district under 28 U.S.C. § 1391(b)(2) because

5  all the complained of activities herein were directed at San Francisco-based Eliza Labs and Shaw

6  Walters and took place in San Francisco, California.

## DIVISIONAL ASSIGNMENT

8  29.    Pursuant to Civil L.R. 3-2(c), this case may be properly assigned to the San

9  Francisco (or, less preferably, Oakland) Division of the Northern District of California because a

10  substantial part of the events or omissions giving rise to the claims herein occurred in the City and

11  County of San Francisco, California.

## FACTUAL BACKGROUND

13  30.    This case arises against the backdrop of a rapidly developing industry: deploying

14  artificial intelligence ('AI') tools on social media platforms. In this emerging market, access to

15  platform data and real-time user interactions is essential for competitive success. There currently

16  exists a race to make effective, reliable AI tools to run on social media platforms to allow

17  marketing, customer engagement, branding, market analysis, and predictive directional steps to be

18  performed autonomously, thereby maximizing user engagement and content sharing, meanwhile

19  liberating time for individuals and companies to focus on other endeavors.

20  31.    For purposes of antitrust and unfair competition analysis, there are three relevant

21  economic markets here: (1) Microblogging Social Media Platforms (2) Generative AI Chatbots or

22  AI Agents and (3) Social Media about AI. The relevant geographic markets for all three Markets is

23  the United States. Ss explained *infra,* X has monopoly power in the Microblogging Social Media

24  Platforms Market and the Social Media about AI Market. X.AI has, or, in the alternative attempts

25  to have, monopoly power in the Generative AI Chatbots or AI Agents relevant market. X's

26  platform is the dominant, and in many respects the only, viable venue for AI Agent or Generative

27  AI Chatbot tools and discussions because of its unparalleled real-time communication network

28  and scale of user-generated data.

PLAINTIFFS' AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE AND DECLARATORY RELIEF

32.     The X platform and AI tools on the X platform are used in interstate commerce and the activities described herein have a substantial impact on interstate commerce.

### AI Agents (aka Generative AI Chatbots)

33.     AI Agents (referred to interchangeably herein as "Generative AI Chatbots" or "AI Agents") are computer programs that can act independently to complete tasks or achieve goals, similar to having a digital assistant that can think and take actions on its own. AI Agents are autonomous or semi-autonomous software programs that use artificial intelligence techniques to perceive their environment, make decisions, and take actions to achieve specific goals. AI Agents are in effect intelligent assistants or workers that can operate on their own (or with minimal guidance), often mimicking human decision-making processes.

### Plaintiffs' Software for Building AI Agents

34.     Plaintiffs are at the forefront of developing software tools to facilitate creating individual next-generation autonomous agent systems, or AI Agents, to operate on social media platforms. Eliza Labs has a host of open source software products available for download that allow individuals and others to operate AI Agents on a variety of platforms.

35.     In the months after its founding, Eliza Labs successfully created several open source product offerings that allowed its customers to build AI Agents. Eliza's open source offerings quickly became popular, some of which operated on Twitter's application program interface (API) so that users of Eliza's software could use these AI Agents to process and respond to tweets on X.

36.     In or around late 2024 and throughout early 2025, at X's request, X reached out to Eliza Labs to engage Eliza in discussions about AI Agents running on X's platform. X had received billions in investment for this type of AI research and development and, on information and belief, was gathering information about how best to implement AI on X.

37.     Because Eliza's tools gained traction and demonstrated novel capabilities, X initiated discussions directly with Eliza's founder, Shaw Walters, including in-person meetings at X's offices. In these discussions, Walters shared extensive details about Eliza's architecture, development roadmap, and vision for AI Agents.

22175305.4

38.    Here is a screenshot showing of one of X's emails (from X's AI researcher and developer Evan Dolgow) to Shaw Walters where X represented that it was "[l]ooking forward to advancing the AI Agent vision together."



**Evan Dolgow** <
To: CJ Yance <
Cc:                                                                    3 February 2025 at 06:27

Morning CJ - just sent the invite.

Looking forward to advancing the AI Agent vision together. Shaw has my number if he needs anything.

Best,
Evan

39.    Over the course of numerous conversations, including in-person site visits to X's offices, Mr. Walters and Eliza Labs provided extensive details about their AI Agents, including where they saw need for new development, where they envisioned the future of AI Agents being, and how they developed software tools to maximize AI utility and advancements in the space. Mr. Walters and Eliza Labs believed they were collaborating with X to build an exciting new internet where all people would be able to access and to utilize AI Agents to maximize utility, access to high-caliber and reliable information, and efficiency.

40.    During these discussions, X asked for Shaw's opinion on the pricing and availability of their developer license and higher tier Enterprise API access. Shaw indicated in person that if Eliza Labs were to make a commercial product in the future, Eliza Labs would consider buying the license as needed. Suddenly, X began to state that, to continue to operate on X, Eliza Labs must spend $50,000.00 per month ($600,000.00 per year) for X's Enterprise API access. Here is a screenshot from X demonstrative of this abrupt shift from engaging collaboratively on developing AI to demanding X pay for an Enterprise License to continue its pre-existing operations:

PLAINTIFFS' AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE AND DECLARATORY RELIEF

22175305.4

Hi Shaw,

Hope you are well, reaching out regarding our API conversations. We ultimately value your passion for hacking and building the Eliza.os framework to enable agentic use cases on X. We recognize that some of Eliza's hacked functionality stems from DevPlatform limitations and have taken this feedback to our engineering team.

However, Eliza.os & Eliza.systems has raised significant flags with X Policy for API circumvention, unverified government customers, and unapproved use cases. Legal was set to contact you directly but given our relationship, we've managed to pause that process for now.

Please understand that while we appreciate innovation, compliance with our guidelines is non-negotiable. We're open to discussing solutions, mainly Enterprise API access, that enable you to become compliant with X ToS.

Please let us know if you are free to chat Thurs/Fri this week or Mon/Tues of next week.

Best,
Evan

41.     The above reads like extortion: "we assert that you have violated our rules, but if you pay us money, we will look the other way." Critically, X never identified any way in which Plaintiffs' operations on X violated X's ToS.

## X's Expensive Enterprise License Scheme

42.     As is well documented in the media, after the Musk takeover of Twitter, advertisers (but not users) began fleeing the platform, resulting in revenue loss for X. These losses continued in response to Musk's actions throughout 2024 and 2025.

43.     To generate revenue, X was forced to develop novel revenue streams. Shortly after the takeover, Twitter eliminated all free access to its API and developed various tiered access systems to X's API. X also began to require users to pay for verified accounts, charging users $10,000.00 to have a checkmark by their name. For the first time, X introduced for-pay accounts to access data or "re-tweet" information on X.

44.     Initially in Fall of 2023, these new for-pay accounts/licenses cost a few thousand dollars a year to access X's API. Over the next year and a half, X steadily increased the cost of these accounts. By the end of 2024, X's account/API fees were as much as $50,000.00 a year.

45.     On information and belief, X further appreciated that, because of the broad, unchallenged immunity the Courts awarded X under 47 USC § 230 ("Section 230"), X could wield the threat of deplatforming to induce acceptance of whatever license terms X dictated. On information and belief, X's licensing scheme was not designed to cover costs, but to leverage the

PLAINTIFFS' AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE AND DECLARATORY RELIEF

1  existential threat of deplatforming, for which X faced no consequences and which X's terms of use

2  for all account tiers permitted at X's sole discretion, to coerce developers into paying exorbitant

3  sums for API access, which X now does.

4        46.    By way of example, if a user whose business depended on communicating and

5  engaging through X's platform refused to pay X's demanded sum to maintain its existing

6  license/account, then X would threaten deplatforming (or actually deplatform) the user. Believing

7  filing suit to address X's "publishing decision" to deplatform futile, the user would accede to X's

8  demands; what other choice did the user have if it needed access to the monopoly platform to

9  operate and communicate about its business.

10        47.    Following routine increases throughout 2025, to date, X's "pay-to-play" API- and

11  data-access scheme can cost a user as much as $210,000.00 *per month*, or *$2,520,000.00/year* to

12  post, to view content, to use X user-generated data, and to otherwise operate on X. The expense of

13  an account such as this effectively eliminates all individual users—and all but large corporate

14  actors—from obtaining Enterprise API access to operate on X.

15        48.    This matters because, on information and belief, X now attempts to restrict the use

16  of AI Agents only to users with Enterprise Licenses. This is a new tactic for X. Users used to be

17  able to use AI Agents on X with only a Developers License, costing less than $12,000.00/year.

18  Indeed, before the Musk takeover, access to Twitter's API was free.

19        49.    On information and belief, X has now forced numerous users in the crypto and/or

20  AI space to accept Enterprise APIs by threatening to deplatform them, or by in-fact suspending

21  their accounts (deplatforming them) only to reinstate their accounts after adopting an Enterprise

22  License. This scheme had the effect of excluding smaller companies, open-source developers, and

23  startups from the market for AI Agents on X, reserving participation for only the wealthiest

24  corporations or X's own affiliated entities, such as the X.AI Entities.

25                    **Non-Publishing Consequences of Deplatforming**

26        50.    The effects of deplatforming a user are not limited to restricting the publishing of

27  third-party content. This is critical because the Section 230 analysis employed by Courts to

28  evaluate immunity considers whether the action was a "publishing" decision affecting "third party

1   content." If the action extends significantly beyond content moderation, then Section 230

2   immunity should not apply.

3          51.     When deplatformed from X's social media platform, that user is affected far

4   beyond his ability to publish content. The user becomes unable to access his posting history,

5   unable to view any historical communications he had on the site, and unable to view new posts by

6   anyone (including the White House, thereby potentially missing vital news). This is far different

7   than a newspaper declining to publish an article, whereby the article's author may still read the

8   newspaper and access any of his communications with the newspaper's editors. Deplatforming a

9   user from X has far more extensive and serious consequences than simply restricting a user's

10  ability to publish content.

11         52.     Accordingly, X's decision to deplatform Eliza was not an editorial or publishing

12  judgment about third-party content, but a broader business decision that disabled Eliza's ability to

13  function, communicate, and compete in the marketplace. Deplatforming also cut-off access to

14  years of DMs with users, collaborators, and investors, which cannot be replicated elsewhere.

**X's Deplatforming of Plaintiffs**

16         53.     On or around June 10, 2025, X suspended developer accounts @ElizaOS and

17  @shawmakesmagic belonging respectively to Eliza Labs and Shaw Walters. Eliza Labs and Shaw

18  Walters collectively pay $1,200/month for their accounts, and Eliza recently purchased the "gold

19  tick" from X for $10,000.00.

20         54.     As explained *supra*, X's deplatforming of Eliza Labs occurred after months of

21  meetings between X's Head of Data and API (Evan Dolgow) and Eliza Labs's Shaw Walters, and

22  after X demanded that Eliza Labs pay $50,000.00/month to continue to operate on X, which (X

23  knew) Eliza Labs could not do and did not need to do to comply with X's terms and conditions.

24         55.     X then claimed that it deplatformed Eliza Labs and Mr. Walters because the

25  accounts violated X's terms and conditions (they did not, and X knew they did not), but a series of

26  communications throughout June, July, and August, 2025, between X and Eliza Labs renders this

27  claim demonstrably false.

28         56.     At all times since their suspension, both accounts complied fully with X's terms

22175305.4

1  and conditions, as demonstrated in numerous communications wherein Eliza Labs painstakingly

2  explained its full and complete compliance. Throughout these communications, X never once

3  identified any specific deficiencies in the accounts' compliance with X's terms and conditions.

4  Eliza Labs, repeatedly, in exhaustive detail, demonstrated its full compliance with X's terms and

5  conditions, responded fully and completely to every request from X for more information,

6  documentation, and descriptions, and waited patiently for X to reactivate its accounts. Plaintiffs

7  did not need X's Enterprise API to operate because Plaintiffs operations were entirely covered by

8  their existing Developer License and Account.

9      57.    Throughout June, July, and August, 2025, X used purported "cease and desist"

10  communications to pump Eliza Labs for information about creating, developing, building, and

11  deploying AI Agents. On information and belief, X held out the promise of account reinstatement

12  to induce Plaintiffs to spill as much information and detail as possible about its operations on X,

13  which Plaintiffs did, assuming that if X understood exactly what Eliza did and how, that X would

14  reinstate Plaintiffs' accounts.

15      58.    For example, on June 13, 2025, after already providing additional details to X

16  explaining that Eliza's operations on X were fully compliant with X's terms and conditions, X

17  acknowledged Eliza's compliance, but nevertheless demanded that Eliza complete a use case

18  questionnaire:

19          "Thank you for your email and good faith efforts to remediate the
            breaches explained in our June 10 letter.
20

21          "As immediate next steps, please (1) provide documents
            confirming all services accessing X Data have been permanently
22          removed from your product and website; and (2) fill out the
            attached Data Licensing Use Case Questionnaire with as much
23          detail as possible.

24          "Once these steps are taken, we will quickly evaluate your use case
            for access to our official Enterprise API. We look forward to a
25          compliant and mutually beneficial partnership in the future."

26

27      59.    This use case questionnaire had specific asks around how Eliza accessed endpoints,

28  workflows for ingesting data, and more implementation-specific details that represented a deep

22175305.4

dive into Eliza's product offerings.

60.     Then, on June 30, 2025, X asked for direct access to Eliza's framework:

"Access to ElizaOS.ai's Framework for Investigation.

"Please grant X access to ElizaOS.ai's framework, including API endpoints and data pipelines, to verify compliance with X's API Developer Policy and ToS."

"Provide a detailed explanation of Eliza.Systems business model, system architecture, data flows, and storage practices[.]"

61.     Then on July 23, 2025, X made additional demands:

"Our internal teams have reviewed the material you sent and have requested the following: documentation showing all X endpoints ElizaOS previously publicized for DMs, post scraping, and all X functionality in general. ElizaOS had two products capable of scraping/hacking X -- a v1 & v2 release -- so please send documentation from both repositories for our team's review.

"Additionally, if ElizaOS could provide context on each endpoint explaining what they did and how, that would be helpful."

62.     All of these demands came from faceless, nameless "X Litigation Demands" or "X Legal" or "Litigation" email addresses and email signatories. Despite repeat requests from Eliza Labs and its own identified counsel, at no point has X provided the names. To date, despite attempts to resolve this dispute before filing, X only communicates through "litigation@twitter.com" or "legal@x.com" email addresses, and never with a named signatory to any email, begging the question of whether licensed lawyers are involved at all.

63.     Although the Eliza Labs's code and software for its AI Agents are open source, Eliza Labs and Shaw Walters possess considerable knowhow not reflected in the code. It is this knowhow—the details of implementation, explanations surrounding functionality, and education about which coding choices Plaintiffs made where and why—that X accessed throughout the cease and desist process: a detailed, first-hand education from the coders themselves about how to implement, operate, and optimize the open source software to make effective and seamless AI Agents for users with attractive features missing from Grok.

64.     At all times that X requested this detailed, specific information, the X Entities knew that they were already developing AI Agent Ani to incorporate the same functionality that Eliza's AI Agents had. Eliza, however, was not aware of this. Eliza had no idea that X and X.AI were developing or launching new functionality to X.AI's Grok (new AI Agent "Ani"), which the X Entities launched after these technical communications with Eliza. As explained *infra*, X.AI's Ani contains features that exactly copy Eliza's AI Agent's features, each of which X and X.AI deployed after Eliza and Walters explained how they work.

65.     Despite Eliza Labs's good faith compliance with all of X's demands, and despite Eliza's complete, detailed, and onerous information sharing, X refused to reactivate Eliza Labs's and Shaw Walters's accounts.

66.     As of this filing, X continues to hold the accounts hostage. X also blocks all links to Eliza's Github and website, regardless of who posts the links. Neither Eliza's website nor its Github may be posted anywhere on X's platform by anyone.

### X Launches New AI Agents That Are Nearly Identical to Those that Plaintiffs' Open Source Software Allows Users to Build

67.     While Plaintiffs' accounts remained suspended—and after Defendant elicited highly detailed technical information from Plaintiffs under false pretenses—Defendant launched its own AI Agents that mirror Eliza's offerings. Defendant's equivalent products were enabled by Defendant's fraudulent inducement and exclusionary conduct, which deprived Plaintiffs of market access while Defendant launched materially identical AI Agents. By launching these copycat products while keeping Plaintiffs deplatformed, Defendant eliminated competition, ensured its own products faced no rival on its platform, and positioned itself to monetize Plaintiffs' innovations without incurring development costs, all possible because of X's monopoly position in the short form public posts social media market.

68.     X's new offerings and Eliza's AI Agents perform the identical functions as follows:

| Feature/Functionality | ElizaOS (Plaintiffs) | X's AI (Defendant) |
|---|---|---|
| **3D Avatars** | ElizaOS avatars integrated with Character Studio, including 3D | X.AI's avatars launched with identical 3D character, voice, and |

PLAINTIFFS' AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE AND DECLARATORY RELIEF

| Feature/Functionality | ElizaOS (Plaintiffs) | X's AI (Defendant) |
|---|---|---|
| | characters with voice, animation, and world integration. Entirely open source. | animation features. |
| **User Interaction on Platform** | ElizaOS hallmark feature: integration with X platform for real-time interactions. Powered major community projects (e.g., @elizawakesup). | X's "Grok" conversational chat and AI characters now perform the same interactive functions. |
| **Voice + Video Support** | ElizaOS plugins for real-time text-to-speech and avatar video feed. | X's new characters provide real-time speech and video integrations. |
| **Telephone Integration** | ElizaOS integrates with Twilio for calls/text via phone numbers. | X.AI's "Ani" and "Valentine" agents now use phone numbers for calls/text. |

69.     By way of illustration:

     **A.     3D Avatars:**

ElizaOS avatars are integrated with Character Studio, created by Shaw and community

members. ElizaOS is fully integrated with 3D characters with voice, animation and even

3D world integration. All of this code is open source.

ElizaOS Avatars:

 

Case No. 3:25-cv-07243-AMO

PLAINTIFFS' AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE AND DECLARATORY RELIEF

22175305.4

1
2
3
4
5
6
7
8



9  X.AI Avatars:

10
11
12
13
14
15
16
17
18



19  **B.    AI voice and video support:**

20  ElizaOS has plugins and integrations for real-time text-to-speech and avatar video feed:

21
22
23
24
25
26
27
28



Case No. 3:25-cv-07243-AMO

X's new "characters" do the same:



### C.    Voice and text telephone integration:

ElizaOS features call and text by phone number using Twilio integration:



X.AI's Ani and Valentine agents now have phone numbers to call:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23



24  Eliza's initial commit of the newest version of our calling integration was on June 16,

25  2025; X released this functionality on August 16, 2025.

26      70.    Members of the developer and user community, including independent

27  commentators on X, immediately noted the striking similarities between ElizaOS and X's new

28  'characters' and publicly called out the overlap, as shown in the following examples:

PLAINTIFFS' AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE AND DECLARATORY RELIEF

22175305.4

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26





27    71.    Ani, X's AI companion, launched on July 14, 2025. This was about a month after

28  Eliza's ban on June 10, 2025. X's AI tool Grok added functionality on March 7, 2025, one month

Case No. 3:25-cv-07243-AMO

PLAINTIFFS' AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE AND DECLARATORY RELIEF

22175305.4

1  after Walters visited X's headquarters twice to provide details on how to build X AI Agents.

2        72.     Accordingly, on information and belief, not only did X pretextually accuse Eliza of

3  violating X's terms and conditions when it did not, X fraudulently induced Eliza to rely on X's

4  promises of account reinstatement to extract crucial information from Eliza, which X then

5  parlayed to develop its own software that performed the same functions Eliza's performed, in the

6  same manner, to achieve the same objective, meanwhile eclipsing any use of Eliza's AI Agents on

7  X because Eliza remained deplatformed.

8        73.     On information and belief, Defendant finalized and launched these AI features only

9  after extracting detailed implementation knowledge from Plaintiffs during the months when

10  Plaintiffs' accounts were suspended and being 'reviewed.' Defendant's timeline for launch tracks

11  precisely with the period during which Plaintiffs were repeatedly asked to provide seriatim

12  technical explanations and documentation.

13        74.     On information and belief, Defendant never intended to reinstate Plaintiffs'

14  accounts. Instead, the suspension was a calculated pretext to extract know-how, eliminate a

15  competitor, and clear the field for Defendant's own product launch.

16        75.     X's actions were not only fraudulent, but also they are textbook anticompetitive

17  acts intended to harm a competitor, to drive up prices for its own copied products, to stymie

18  competition, and further to reduce free access to information posted on the internet.

19        76.     X's actions harmed, and continue to harm, Eliza Labs in many ways, including but

20  not limited to depriving Eliza and Walters access to paid accounts, silencing Eliza and Walters's

21  voices on a prominent social media platform, preventing Eliza from disseminating its products to

22  users, interfering with Eliza's ability to raise capital or other funding, creating a knock-off copied

23  version of Eliza's AI Agents and profiting off them, and ultimately excluding Eliza from the

24  marketplace for AI Agents on X. X's fraudulent deplatforming has damaged Eliza's relationships

25  with customers, harmed Eliza's reputation, and impeded (intentionally) Eliza's growth. X's

26  actions also blocked Eliza's distribution channels, cutoff its ability to attract users and investors,

27  and deprived Eliza of a fair opportunity to compete.

28        77.     X benefited, and continues to benefit, from its anticompetitive and fraudulent acts.

X launched new AI Agents without incurring significant development costs because its agents are mere copies of Eliza's AI Agents, and X hoodwinked Eliza into educating X about how to create, implement, and optimize these AI Agents to operate most effectively on X's platform. Further, X launched its AI Agents into a competition-free marketplace because, at all times during the launch, Eliza Labs remained deplatformed. Through these actions, X unjustly enriched itself in an amount to be proven at trial well exceeding $75,000.00 given the 12 billion in investments X.AI received in anticipation of the significance of such AI Agents operating on X's platform with X's data. Defendant's enrichment is measurable not only by avoided development costs but also by the billions in valuation and investment secured for X.AI, which were predicated in part on innovations that Defendant misappropriated from Eliza.

78.    Additionally, the reputational harm to Eliza Labs and its founder Shaw cannot be overstated. Prior to the abrupt and unannounced deplatforming, Walters had roughly 156,000 followers and Eliza had roughly 150,000 followers. These followers were left without any understanding or explanation of why Eliza and Walters suddenly disappeared. Disappearing without notice or explanation makes it appear as if Eliza ceased doing business altogether, was an unreliable company, did not care about its customers, was a failing company, or had done something wrong, when none of these things is true and each of them harms Plaintiffs' reputations significantly.

79.    This reputational harm has forever affected Eliza's ability to attract funding. Eliza is – or was – actively engaging with venture capital funding source and in the process of securing additional funds. X's actions hurt, seriously, Eliza's ability to raise capital or to receive funding.

80.    In addition, many consumers and builders were left without viable sources of information about the project and framework developments since X was Eliza's place of update distribution about its business activities, as X knew (or should have known).

81.    The unexplained disappearance of Plaintiffs' accounts left Plaintiffs' followers and customers to guess about what happened to Plaintiffs, such as is represented in these examples of speculation and commentary later posted on X:



Case No. 3:25-cv-07243-AMO
PLAINTIFFS' AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE AND DECLARATORY RELIEF

22175305.4

1

2    **Tom K Sebastian** @TomKSebastian4 · Aug 7
     In the last few days I saw a lot of real projects powdered by elizaos. Bro

3    meanwhile any update on X. You said one more last week

4    💬 1          ↻          ♡ 1          📊 78                    🔖    ⬆️

5    ▬MaSk
     @Mark_Ska76

6
     Disappointing that @ElizaOS and @shawmakesmagic are not able or
7    willing to reactivate X or any other channels of communication 🙁

8    10:57 PM · Aug 7, 2025 · **68** Views

9          82.    Furthermore, X now blocks anyone—not just Plaintiffs—from posting links to

10   Plaintiffs' GitHub, which is where customers go to download Plaintiffs' AI software building

11   tools. In other words, X does not allow any links to Plaintiffs' products on X, regardless of who

12   posts the links. X entirely prohibits any links to any of Plaintiffs' products appearing anywhere on

13   X's platform.

14          **Section 230 Does Not Immunize X for Anticompetitive and/or Fraudulent Acts**

15          83.    While social media providers such as X enjoy immunity for decisions to publish (or

16   to delete) third party content, this immunity is limited by the plain language of 47 USC Section

17   230 to "'Good Samaritan' blocking and screening of offensive material" to achieve the expressly

18   stated policy objectives of, *inter alia*:

19                    "promot[ing] the continued development of the Internet and other
                      interactive computer services and other interactive media;
20
                      "preserv[ing] the vibrant and competitive free market that
21                    presently exists for the Internet and other interactive computer
                      services, unfettered by Federal or State regulation; [and]
22
23                    "encourage[ing] the development of technologies which maximize
                      user control over what information is received by individuals,
24                    families, and schools who use the Internet and other interactive
                      computer services[.]"
25

26   *See* 47 USC § 230 (b), "Policy."

27          84.    X's actions here of blocking links to Eliza's website, blocking links to Eliza's

28   Github, and deplatforming AI Agent competitor Eliza (1) to extract details regarding the use,

                                                    24                    Case No. 3:25-cv-07243-AMO
     PLAINTIFFS' AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE AND DECLARATORY RELIEF

1  implementation, and development of Eliza's AI Agents on X and (2) to achieve a competitive

2  advantage of marketing, without competition, an equivalent (nearly identical) AI Agent

3  emphatically fly in the face Section 230's stated rationales for conferring immunity to entities such

4  as X.

5      85.    Moreover, X's actions are not publishing decisions at all; they are calculated and

6  cunning business decisions designed to destroy competition, erode a vibrant and competitive free

7  market, extract money and information from competitors, and stifle the continued development of

8  the internet so that the spoils of innovation remain concentrated in the hands of an elite few who

9  already control information flows.

10      86.    X's acts here are the antithesis of those Congress sought to protect by instituting

11  Section 230 according to the plain language of the statute itself. X cannot—and must not—be

12  immune for deplatforming users to extract money and/or information or to prevent competition.

13      **X, X.AI, and Musk Recognize Tech Giants' Ability to Manipulate AI Markets**

14      87.    Eliza's claims regarding a tech giant using anticompetitive and fraudulent conduct

15  to further the company's burgeoning AI department or sister-company is not a novel ideal to X.

16      88.    For many of these tech giants, the companies both generate the data and then seek

17  to deploy, to control, and to monetize the AI tools that depend on the generated data. This is a

18  novel area fertile for anticompetitive behavior, namely allowing vertically integrated monopolies

19  whereby an existing monopoly (the data generator) may secure the monopoly position of the

20  another monopoly (the AI data consumer) through a variety of unlawful means, most of which

21  occur behind the scenes where end-users remain unaware of the conduct or where the companies

22  claim to be afforded governmental protection for their actions (for example, Section 230 immunity

23  to deplatform any and all AI competitors from X).

24      89.    Indeed, on August 11, 2025, X's Musk accused another tech giant of doing

25  precisely this—using its monopoly power in one market to bolster sales of its vertically integrated

26  AI company and products:

27

28

PLAINTIFFS' AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE AND DECLARATORY RELIEF

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Sam Altman** ✔  @sama · 16h
This is a remarkable claim given what I have heard alleged that Elon does to manipulate X to benefit himself and his own companies and harm his competitors and people he doesn't like.

🔵 **Elon Musk** ✔ ✖ @elonmusk · 17h
Apple is behaving in a manner that makes it impossible for any AI company besides OpenAI to reach #1 in the App Store, which is an unequivocal antitrust violation.

xAI will take immediate legal action.

👥 **Readers added context**

In January 2025, DeepSeek reached #1 overall on the App Store.
abcnews.go.com/Business/deeps...

Just one month ago, on July 18, 2025, Perplexity also reached #1 overall in India's App Store.
hindustantimes.com/technology/air...

Both of these occurred after the OpenAI–Apple partnership announced on June 10, 2024.
openai.com/index/openai-a...

Do you find this helpful?                          Rate it

💬 3.6K        🔁 4.7K        ♡ 49K        📊 8M              🔖  ⬆️

Case No. 3:25-cv-07243-AMO
PLAINTIFFS' AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE AND DECLARATORY RELIEF
22175305.4





21175305.4

PLAINTIFFS' AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE AND DECLARATORY RELIEF

90.     Additionally, two days before filing this Action, Defendants X Corp. and X.AI LLC filed suit against Apple, Inc. and OpenAI, Inc. alleging Sherman 1 and 2 violations, as well as violations of Texas's unfair competition laws. *See* Case 4:25-cv-00914-P, Document 1, Filed 08/25/25 (N.D. Tex) (the "Apple/OpenAI Suit").

91.     In the Apple/OpenAI Suit, Defendants accuse Apple and OpenAI of unlawfully monopolizing and attempting to monopolize the smartphone and generative AI chatbot markets, as well as unlawfully agreeing to restrain competition. Defendants characterize the suit as a "tale of two monopolists joining forces to ensure their continued dominance in a world rapidly driven by the most powerful technology humanity has ever created: artificial intelligence ("AI")."

92.     Defendants X and X.AI claim that: "[w]orking in tandem, Defendants Apple and OpenAI have locked up markets to maintain their monopolies and prevent innovators like X and xAI from competing. Plaintiffs bring this suit to stop Defendants from perpetrating their anticompetitive scheme and to recover billions in damages." *Id.*

93.     Clearly, X and X.AI are projecting: they accuse Apple and ChatGPT of unlawful anticompetitive behavior that is precisely the behavior Defendants employ here: with a monopoly in a specific market that creates massive amounts of user data and inputs (Apple and X), entering an agreement with another company (OpenAI and X.AI) to integrate AI Agents (aka Generative AI Chatbots) into the operating system of the device/platform. This is distinct from simply running AI software on a platform or device: the new AI functionality (here, AI Agents or Generative AI Chatbots) are integrated into X's application program interface ("API") and into Apple's operating system (iOS) so that these AI features are inseparable from and integral to the API/iOS. Compare downloading an AI app to use on Twitter or on an iPhone, which such AI app never integrates into a platform's or smartphone's software but merely runs on top of the existing software structure, able to be added or deleted at a user's discretion.

94.     According to X and X.AI itself, this behavior is anticompetitive and unlawful because it constitutes one actor (Apple or X), which has a monopoly position attributable to some other capability (smartphones or microblogging), which such capability yields an incredible amount of user data and user inputs, all of which is collected/owned by the actor (Apple or X),

22175305.4

1  agreeing to provide one – and only one – other actor (OpenAI or X.AI) access to this abundant

2  supply of data and user inputs for the purpose of creating, adapting, training, and/or improving AI

3  Agents/Generative AI Chatbots *to the exclusion of all other participants in the market* (X or Eliza)

4  and in a manner that cannot be extricated from the API or iOS.

5    95.    In other words, Defendants know that the conduct Plaintiffs complain of here

6  violates antitrust laws. Defendants are being treated by other large players the same way

7  Defendants are treating Plaintiffs: excluded from providing competing AI tools to run on

8  monopoly systems that inherently have access to incredible amounts of user training data.

9  Defendants further recognize that this exclusion has impacts beyond the immediate economic

10  harms of lost sales: AI tools are iterative and only as good as the data they are fed, meaning that

11  the benefit to an AI developer of providing exclusive use of a monopoly's troves of user data and

12  inputs results in disparate abilities to develop new AI products, too. The AI companies with

13  greater access to data (here, Apple's or X's data) will be able to develop better AI products. Being

14  natively imbedded in a software ecosystem (*eg*, embedding ChatGPT in iOS or Grok/Ani in X's

15  API) ensures superior access/training and thus a superior product.

16    96.    In X and X.AI's own words:

17        "As a result of the Apple-OpenAI deal, ChatGPT is not just the
         default—it is the *only* generative AI chatbot with a first-party
18        integration into Apple's smartphones. As reflected in Figure 1, this
         means that iPhone users who want to use a generative AI chatbot
19        for certain tasks on their iPhones can use *only* ChatGPT."

20    *Id.* (emphasis in original).

21

22    97.    So too here. As a result of X and X.AI's integration of the Grok/Ani AI Agent or

23  generative AI chatbot into X's API (*id.* ¶ 69), X.AI is the *only* generative AI chatbot with a first-

24  party integration into X's platform. This means that X users who want to use a generative AI

25  chatbot for certain tasks on X can use *only* Grok/Ani. With X's further actions of blocking all

26  links to Eliza's website and Github, as well as deplatforming Eliza and Walters so they are unable

27  to advertise their products in the largest AI online community in existence, Defendants unlawfully

28  restrain trade.

21175305.4    PLAINTIFFS' AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE AND DECLARATORY RELIEF

98.    Defendants X and X.AI further recognize the importance of network effects on excluding competition. As explained in their complaint against Apple/OpenAI,

> "Generative AI chatbots involve significant network effects and scale advantages that exacerbate the economic effects of foreclosure. Where scale begets scale, exclusive access to a massive number of prompts has cemented and will continue to cement ChatGPT's market position and insulate it from competition. ChatGPT was already the largest AI chatbot before the arrangement with Apple. Since Apple and OpenAI entered into the arrangement, rivals have had little hope to catch up on the scale needed to fairly compete with ChatGPT.
> …
> "These effects on the market—less competition, less scale necessary to compete, less investment, and less innovation—ultimately harm consumers through lower quality, less choice, and higher prices than would exist in the but-for world without Defendants' anticompetitive conduct."

99.    Defendants X and X.AI cannot in good faith prosecute a case seeking to redress the same wrongs they commit against others without acknowledging the harm their anticompetitive actions described herein caused, and continue to cause, Eliza and Walters.

## **Relevant Markets**

Microblogging Social Media Platforms

100.    Microblogging social media platforms are a relevant antitrust market.

101.    Microblogging platforms (X, Threads, Bluesky) are *public-by-default, text-first, real-time conversation networks* built on open interest graphs—optimized for immediacy and discourse—whereas most other social apps are *media-first, creator-centric ecosystems* optimized for consumption, storytelling, or private socializing. Microblogging prioritizes *brief, text-forward posts* and *rapid, public conversation*. This "public-by-default, fast-twitch" nature is a defining trait of microblogging. The core loop is "post → reply/quote → repost," optimized for minutes-to-hours half-lives and breaking discourse. Microblogging runs on an *open interest graph*: you follow topics, journalists, public figures, and communities you don't personally know; anyone can reply, quote, or amplify. Microblogging centers *multi-party, threaded conversation* in the open. Quotes and mentions create branching dialogs that are easy to enter and observe.

PLAINTIFFS' AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE AND DECLARATORY RELIEF

22175305.4

Microblogging couples a *chronological or near-real-time timeline* with *trending topics/hashtags*, surfacing what the world is talking about *now*. Microblogging is where *journalists, policymakers, founders, and niche communities* "work out loud." It's built for *live coverage, crisis comms, and idea exchange*. Microblogging ads run adjacent to *fast-moving public debate*, which can raise *brand-safety* and adjacency concerns (and pricing pressure) more than curated feeds do.

102.    Microblogging platforms are the internet's "town square" and remain pivotal for news cycles, politics, and live events.

103.    Other social media platforms are not reasonable substitutes for microblogging platforms. Other social media (e.g., Instagram, Facebook, LinkedIn, TikTok, YouTube, etc.) center *rich media* (images/video), longer attention windows, and creator/consumption patterns that feel more broadcast than conversational. Other platforms lean heavily on *friend/creator graphs* (Facebook/Instagram) or *interest-only feeds* driven by content similarity rather than public back-and-forth (TikTok/YouTube). Other platforms push discussion to *comments beneath a primary asset*, or into *private groups/DMs*, which limits the free-form, multi-thread participation typical of microblogging. Other platforms range from closed (TikTok, Instagram) to selectively open (Reddit's evolving API). The degree of openness affects developer ecosystems, research, and market multi-homing. Other platforms prioritize *algorithmic recommendation engines* tuned for session length and watch time; "trending" is often secondary to personalized ranking. Other platforms excel at *storytelling and entertainment*: high-production video (YouTube), short-form video virality (TikTok), visual identity (Instagram), professional branding (LinkedIn), or deep community forums (Reddit/Discord). Other platforms offer *predictable placements* in videos, Given the feature and price differences, a hypothetical monopolist of smartphones

104.    Given the feature and use differences, a hypothetical monopolist of microblogging platforms could implement a small but significant non-transitory increase in smartphone prices without microblogging customers switching to other social media platforms to avoid such a price increase. Users of microblogging platforms frequently have several social media accounts on various types of platforms, including microblogging platforms, because the social media platforms serve different purposes and functions and are not interchangeable products.

105.    Microblogging platforms are recognized as distinct from other social media platforms by industry sources and by the public at large. Bluesky and Threads, for example, advertise themselves as alternatives to X after Musk's takeover as a reflection of user's distain for Musk.

106.    Users of microblogging social media platforms do not find other social media platforms to be suitable substitutes. Social media users typically have multiple social media accounts, all for different purposes. Microblogging users also have other social media accounts that they use for other purposes. Meta's Threads demonstrates this clearly: every Threads user has an Instagram account, which the users post on for entirely different purposes. Frequently, users have a professional social media account (LinkedIn), a long form private social media account (Facebook/Instagram/Reddit), and a microblogging social media account (Twitter/X). Moreover, users use these various types of social media accounts for different purposes – communicating with colleagues v. friends v. sharing news, so they are not substitutes for one another.

107.    Users go to microblogging for *real-time, public conversation and reach*. Short-video apps or image feeds are poor substitutes when the job-to-be-done is *participating in live, text-based discourse*.

108.    A platform optimized for long-form video or private friend graphs cannot easily "flip a switch" to become a real-time, text-first, open conversation network; the *engineering, policies, moderation, and cultural norms* are distinct.

109.    Microblogging connects *speakers ↔ audiences ↔ advertisers ↔ developers* in a way that values *speed + public reach* over production value. That two-sided (really, multi-sided) dynamic justifies a separate cluster from the broader "social media" category for competitive-effects analysis cementing microblogging platforms as a distinct social media market.

110.    X's Enterprise API price increases developments, discussed *supra*, shows that, even if X imposes a small (or even large) but significant and non-transitory increase in price, users and particularly AI developers, do not defect to competitors but continue to use X.

111.    Because network effects are critical to microblogging platforms, BlueSky and Threads today struggle to attract a critical mass of users as is required for social media companies

1   to function. Barriers to entry, costs of development, and network effects prevent competition with

2   X, despite concerted efforts by millions of people to flee X.

3          112.    The relevant geographic market for microblogging platforms is the United States

4   because the U.S. is the largest user of these platforms. Alternatively, the geographic market is

5   global because the platforms are internet-based and widely accessible throughout the world (with

6   the exception of certain countries/regions where X/Twitter is blocked).

7   Generative AI Chatbots or AI Agents

8          113.    Generative AI chatbots are a relevant antitrust market.

9          114.    X.AI LLC and X.AI Corp.'s complaint against Apple/OpenAI explains in detail

10  that Generative AI Chatbots or AI Agents are a relevant antitrust market. *See* Case 4:25-cv-00914-

11  P (N.D. Texas), Dkt.1, pp. 34-39 (incorporated herein). The parties therefore agree and do not

12  dispute that generative AI chatbots, aka AI Agents, are a relevant antitrust market. The parties

13  further agree and do not dispute that the relevant geographic market is the United States, or,

14  alternatively, globally excluding countries where such services are blocked.

15  Social Media about AI

16         115.    In the alternative only, the relevant market is the sub-market of social media

17  platforms where AI discussions occur. This is a relevant, economically distinct sub-market of a

18  hypothetical broader antitrust market of social media including all social media platforms,

19  regardless of post length, use, public/private orientation, and distribution format.

20         116.    In the alternative only, such social media platforms for AI constitute a relevant

21  antitrust market because they are distinct locations on the internet that attract a specific type of

22  content and user for which there is no reasonable alternative and in which, no users will defect

23  upon price increases to other locations because of network effects and other barriers to entry such

24  as cost, time, and a critical mass of users.

25         117.    X's platform hosts the most discussions about AI of all social media platforms. X's

26  platform is the place for persons interested in AI to gather to discuss AI advancements, AI Agents,

27  AI chatbots, AI investment, AI startups, AI technologies, large language models (LLMs), and any

28  and all topics related to AI.

118.    No other social media platform, including microblogging platforms, hosts any community or activities for AI to the same degree that X hosts these conversations.

119.    The AI community refers to X's platform specially as "AI Twitter" or "TPOT," ("This Part of Twitter"), even after Musk's takeover and conversion to "X." The AI community follows X closely because it is where all the conversations, news, and discussions about AI are occurring. X houses the largest AI discussion forum on the entire internet.

120.    There is no substitute to the AI discussions that occur on X. Even if someone wanted to host or to participate in AI discussions on another platform or place, it would be impossible because of network effects. Nearly all the other users discussing AI Agents on social media are on X, and all of them, too, would have to change platforms before a new social media platform could support the same level, depth, and breadth of discourse with as large an audience. Achieving this type of coordinated user action without government intervention or significant external incentives is nearly impossible. Therefore, the AI Agent conversations remain on "This Part of Twitter" on X's platform.

121.    Because all of the AI social media discussions occur on X, X has a monopoly over mindshare in the AI industry.

122.    As discussed *supra*, X's move to charging users in the AI space for account verification, developer accounts, and Enterprise API accounts demonstrates that there are no substitute products for users seeking to participate in AI discussions on the internet because X is the central location for AI discussions in social media. There are no additional products to include in the market because there are no similarly active discussions about AI on the internet. Key players in the AI industry regularly post updates and participate in discussions on X, including Sam Altman (OpenAI), Dario Amodei (Anthropic), Jensen Huang (NVIDIA), and Yann LeCunn (Meta). With the current AI explosion, X is a hotbed for all things and discussions related to AI for the United States and most of the world.

123.    According to the website All About AI (available here: https://www.allaboutai.com/ai-agents/statistics/, last visited September 17, 2025), 96% of all mentions of AI Agents on social media occur on X:



- **X (formerly Twitter)**: Dominates with **96%** of mentions (**235,281**), acting as the epicenter for real-time conversations, public opinions, and debate around AI agents.
- **Reddit**: Comprises **3%** (**7,412** mentions), where deeper, user-driven discussions around AI agents often unfold in community forums.
- **Instagram**: Makes up **1%** (**1,668** mentions), focusing on visual storytelling and creative engagement related to AI agents.
- **Tumblr**: Hosts **959** mentions, capturing niche perspectives and unique content around AI agents.
- **Facebook Public**: Reflects broader community engagement with **650** mentions, showcasing public opinion and group interactions.

### **Monopoly Power**

<u>X Has Monopoly Power in the Relevant Market for Microblogging</u>

124.    X is the dominant microblogging platform in the United States.

125.    As of 2025, X has about 586 million monthly active users globally, making it one

PLAINTIFFS' AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE AND DECLARATORY RELIEF

1    of the top 15 social media platforms worldwide. This represents roughly 7% of the world's

2    population.

3        126.    As of 2025, X has about 237.8 million monetizable daily active users.

4        127.    The two other microblogging platforms in the United States (Bluesky and Threads

5    (Meta Platforms, Inc., aka "Facebook"), which is integrated into Instagram and thus not a true

6    stand-alone microblogging platform) experience a small a fraction of X's engagement and use.

7        128.    X receives roughly 500 million posts per day.

8        129.    Threads (Instagram/Meta/Facebook) reports that on the most active day in its

9    history, it had about 95 million daily posts. This is the highest daily active user volume that

10    Threads has reportedly ever achieved. Threads claims roughly 350-400 million total users, but

11    because Threads is integrated into Instagram and Instagram users become Threads users

12    automatically upon onboarding unless they opt out without having to create a separate,

13    independent account, the number of users does not reflect the amount of activity or engagement

14    with Threads. Threads constitutes a small proportion of the microblogging platform use and

15    traffic. Threads garners a small proportion of the microblogging platform market.

16        130.    Bluesky reports a total of 1.905 billion total posts since tracking began

17    May 1, 2023. It also shows ~38.8 million users. A lifetime average across that full period is

18    therefore roughly ~2.2 million posts/day. Bluesky constitutes a very small proportion of the

19    microblogging platform market.

20        131.    Other very small microblogging platforms exist, but these platforms garner a tiny

21    percentage of users. For example, Mastodon has nearly 10 million registered accounts and reports

22    roughly 2 million daily active users.

23        132.    Comparing these daily post figures, and assuming Threads' daily posts to be the

24    highest it has ever achieved at 95 million (a gross over estimate for currently daily activity because

25    the ~95 million posts figure occurred on the first day of launch with significant and not-

26    subsequently-sustained interest/involvement), the total daily posts across all three microblogging

27    platforms equals roughly 600 million posts/day, meaning that X hosts roughly 83.3% of all daily

28    posts giving X a monopoly in the microblogging social media platform market.

133.   Critically, users of the "alternative-to-X" microblogging platforms may also have X accounts; users register for numerous microblogging platforms reflecting the fact that X has a monopoly in the microblogging market as providing an essential service or a natural monopoly.

134.   The President of the United States communicates critical information about the state of the Country using X/Twitter. One must have a user account to view these communications. Other critical news is first disseminated on Twitter/X. For these additional reasons, X constitutes a natural monopoly because it performs an essential function of delivering news and reporting on the U.S.'s state of affairs.

135.   X therefore is the default venue for real-time, public discourse (news, politics, finance), which concentrates attention during major events. X's media relevance and policymaker reach reflects its monopoly power in the microblogging platform market.

136.   X's dominant position in the microblogging platform market is protected by multiple barriers to entry such as cost, network effects, investor availability, and prior attempted competitors (*eg*, Bluesky) failing to compete successfully against X. These barriers to entry inhibit the entrance of new competitors and discourage users from switching from X to other microblogging platforms.

137.   Microblogging platforms exhibit significant network effects. The microblogging platform market is also marked by high switching costs that discourage customers from switching away from X.

138.   X's monopoly power is also demonstrated by its ability to earn consistent monopoly profits. X's advertisement revenue is forecasted to be roughly $2.6 billion in 2025.

139.   X has exhibited direct evidence of monopoly power through its ability to control prices and exclude competitors. X has consistently raised the prices of its products while remaining the dominant microblogging platform. X (Twitter) used to be free. Now, to have a verified account, users must pay $10,000 to get a checkmark by their name. X instituted new charges for developer accounts and Enterprise API accounts, which used to cost users roughly $1000.00/month and now cost as much as $210,000.00/month – an increase of over 20,000%.

140.   X's ability to raise prices 210x while retaining users, AI developers, and remaining

1  the dominant microblogging platform, despite concerted efforts by other microblogging platforms

2  to replace X, demonstrates its monopoly position.

3  X Has Monopoly Power in the Relevant Market for Social Media about AI

4    141.    As explained, *supra*, the social media conversations about AI chatbots or AI agents

5  occur nearly mostly on X. X is the place where users go to participate in AI discussions, to gain AI

6  news, to keep abreast of AI developments, and to communicate with key stakeholders in the AI

7  industry. No other social media platform offers users the same level of discussion or amount of

8  content related to AI, AI Agents, or AI chatbots.

9    142.    The same barriers to entry and network effects discussed above bar other entities

10  from competing to become the virtual town hall for discussions about AI.

11    143.    X's monopoly power can be demonstrated by the amount of AI content on X, the

12  users who remain on X for access to the AI content and AI communities despite X charging for

13  account verification, developer accounts, and Enterprise API access, the fact that other social

14  media platforms do not host large AI communities or provide significant AI content, users' special

15  names for X's AI content, and network effects.

16  X.AI Has Monopoly Power in the Relevant Market for Social Media about AI

17    144.    As explained, *supra*, the social media conversations about AI chatbots or AI agents

18  occur nearly mostly on X. X is the place where users go to participate in AI discussions, to gain AI

19  news, to keep abreast of AI developments, and to communicate with key stakeholders in the AI

20  industry. No other social media platform offers users the same level of discussion or amount of

21  content related to AI, AI Agents, or AI chatbots.

22    145.    The same barriers to entry and network effects discussed above bar other entities

23  from competing to become the virtual town hall for discussions about AI.

24    146.    X.AI's monopoly power can be demonstrated by the fact that the only AI Agent or

25  chatbot integrated into X's platform and operating on This Part of Twitter is Grok. No other

26  chatbot has access to X's vast data and user inputs gleaned from within the application program

27  interface. X.AI is the only – and thus the dominant – AI Agent or chatbot market participant in

28  X's ecosystem.

PLAINTIFFS' AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE AND DECLARATORY RELIEF

## **The X Entities' Anticompetitive Conduct**

147.    X, using its monopoly power, coordinated with X.AI Corp. and X.AI LLC to ensure that the X.AI product Grok has a monopoly over AI Agents operating on X. The only AI Agent or generative AI chatbot that is integrated into the X API and offered bundled with a user's X account is Grok/Rudy/Ani.

148.    Grok is a conversational assistant with advanced reasoning and multimodal capabilities, competing with other generative AI models like ChatGPT. Grok is available in different subscription tiers, with SuperGrok offering premium features. In mid-2025, xAI introduced Grok Companions (Ani and Rudy), a feature that adds animated, interactive avatars to the Grok app. These companions are designed to provide a more personalized and "entertaining" experience for users. These companions are part of a paid feature for Premium+ or SuperGrok subscribers and currently work on iOS. They combine Grok's core AI with custom personality layers like voice, tone, and behavior.

149.    X.AI developed and produces the AI chatbot/Agent Grok. Grok is available as a standalone app for downloading and running on smartphones and other electronic devices. X.AI and X also entered an agreement to integrate Grok into the Twitter/X platform so that the product is part of the X ecosystem, running directly in X's API, using X data, and training with user inputs.

150.    To protect X.AI's Grok product, X and X.AI agree to prevent other AI Agents or chatbots from operating on X's platform. X blocks access to other AI Agents through a variety of anticompetitive actions. X deplatforms users who attempt to make their own AI Agents to operate on X. X uses one-sided, subjective Terms of Service and Terms of Use agreements capriciously to prohibit users from operating AI Agents on X. If X discovers AI Agents operating on X, X either deplatforms the users or attempts to extort hundreds of thousands of dollars in annual "account" or "license" fees. X also deplatforms competitors (eg, Eliza and Shaw Walters) so they are prevented from posting about their products, discussing their company, or otherwise participating in the largest social media town hall to hold discussions about their business and its products. Meanwhile, X allows X.AI's chatbots to operate freely and even *integrates them into X's*

*operating system so the AI Agents/chatbots are inextricable form X.* Meanwhile, the X Entities'
Elon Musk is free to post about, sell, advertise, brag about, tout, and otherwise promote X.AI's
Grok, *while silencing and deplatforming competitors' voices*.

151.    X and X.AI work together to ensure that Grok, and only Grok, is the operative AI
Agent/chatbot on X.

152.    X and X.AI's coordinated actions to restrict all other AI chatbots is anticompetitive
behavior that restricts competition, distorts the market for AI chatbots on X, and ensures that X's
plethora of user data and prompts remains exclusively in the control and possession of X.AI Corp.

153.    Restricting use and access to X.AI's chatbot/AI Agent confers the additional
competitive advantage of greater training, additional exclusive access to data, and additional
exclusive access to user prompts, which enables more iterating and learning that ultimately yields
a superior AI product. By excluding all competitors from also using X's data and user prompts, X
and X.AI ensure that their AI products will improve at a faster rate than competitors' AI
Agents/chatbots, which confers a significant competitive advantage to X.AI achieved through
anticompetitive exclusive dealing and tying agreements with X.

154.    X (in coordination with X.AI) blocks links to Eliza's website, where users can learn
about software that they can use to create their own AI Agents to run on X, in an effort to
eliminate competition with Grok.

155.    X (in coordination with X.AI) blocks links to Eliza's Github, where users can
download software to create their own AI Agents to run on X, in an effort to eliminate competition
with Grok.

156.    Such conduct has no procompetitive justification because it reduces the number of
AI products available to consumer, restricts choice, eliminates competition, and results in higher
prices for consumers (X.AI's premium AI product offerings currently cost $30/month whereas
Eliza's AI Agent software allows users to build the same products with the same functionality for
free). Additionally, the X Entities' conduct eclipses the ability for competitors to access data that
will enable the development of additional AI products because X controls vast stockpiles of data
and user prompts that X only allows X.AI to use for AI model training.

**Defendants' Conduct Has Injured Competition, Plaintiffs, and the Public**

157.    In addition to the harm alleged above, X and X.AI's exclusive deal and related conduct harm competition, Plaintiffs, and the public in the generative AI chatbot and microblogging markets as follows.

158.    Their unlawful agreement has excluded Grok's rivals—including Eliza's AI Agent software —from X-based integrated user data, and together with the other conduct favoring Grok on X's platform (including granting all users free access to Grok with subscriptions to extra features), has prevented AI competitors from deploying their own AI Agents on X or training with X's data.

159.    Defendants' conduct has harmed competition in the market for generative AI chatbots by providing X.AI and Grok massive scale advantages while depriving Grok's rivals, like Eliza's products, from obtaining the scale needed to improve their generative AI models and thus attract more customers. Defendants have completely foreclosed Grok and other rivals from a massive pool of valuable native X user prompts that are available only to Grok and X.AI. On top of this, X's use of its monopoly power to favor Grok in its X feeds and to block links to other competing products prevents Eliza – one of the biggest threats to Grok – from gaining access to user prompts needed to scale.

160.    The deprivation of scale through substantial foreclosure has augmented effects due to the significant data network effects exhibited in the generative AI chatbot market. Without scale, generative AI models perform worse and cannot effectively compete with Grok, the only AI Agent/chatbot integrated into the X platform.

161.    X and X.AI's anticompetitive conduct also discourages investment and innovation in the generative AI chatbot market. The foreclosure caused by the unlawful agreement inhibits innovation on X's platform – the dominant microblogging platform – because Grok's rivals have no reason to develop better models for native X prompts and user data they cannot access. The denial of scale caused by Defendants' conduct limits rival generative AI chatbots from developing new innovations. Moreover, with Grok's lock on the X platform through its exclusive deal with X and with X's thumb pressed firmly on the scale for Grok, investors face significant risk in backing

1    anyone but the dominant market leader on the most utilized microblogging platform in the United

2    States.

3           162.    While X Entities raised $12 billion in funding, other generative AI startups have

4    struggled to raise the funding needed to compete while at the same time being raided by

5    established tech companies for their employees.

6           163.    Because Defendants' conduct has harmed competition in the market for generative

7    AI chatbots and generative AI chatbots operating on X, Defendants' conduct has also harmed

8    competition in the market for microblogging.

9           164.    Consumers have been harmed by Defendants' anticompetitive conduct. In the but-

10   for world, customers would have more choice because they could choose Eliza's AI Agent

11   software or other generative AI chatbots like Claude to run on X's platform and to fulfill their

12   native X prompts. Instead, they are forced to take Grok. Customers in the but-for world would also

13   have access to higher-functionality generative AI chatbots because Defendants' conduct would not

14   have deprived Grok's rivals of scale.

15          165.    Eliza Labs and Shaw Walters have both been injured by this conduct, which has

16   already caused them significant damages that will amount to billions of dollars in combined lost

17   funding, development opportunities, software engineering, and enterprise values.

18          166.    Defendants conduct of blocking links to Eliza's website and Github also harmed

19   Plaintiffs, consumers, and competition because users participating in the largest social media town

20   hall to discuss, learn about, and understand AI Agents were deprived of access to Plaintiffs'

21   products or from learning about Plaintiffs' products. Preventing knowledge or awareness of a

22   competitors' products by preventing all references to them in the dominant market over which X

23   has monopoly control constitutes anticompetitive conduct that harms Plaintiffs and consumers.

24          167.    But for Defendants' anticompetitive conduct—including making Grok the

25   exclusive integrated generative AI chatbot for X users, blocking links to Eliza's Github, blocking

26   links to Eliza's website, and deplatforming Eliza and its founder Shaw Walters—Eliza's AI Agent

27   software would not have been foreclosed from a substantial portion of the market and would have

28   more customers; more app downloads, sales, and profits; and greater scale than it has. Instead,

1    more users would pick building Eliza's AI Agents for their prompts, either via native X

2    integrations or via software downloads, which would give Eliza's AI Agent software more scale.

3    This self-reinforcing scale would allow more innovations in Eliza's AI Agent software and attract

4    both more customers and more investment.

5    ## CLAIM 1

6    ## Unlawful Agreement In Violation Of Section 1 Of The Sherman Act 15 U.S.C. § 1

7    **(Against X and X.AI)**

8    168.    Plaintiffs incorporate and reallege the allegations in the foregoing paragraphs as if

9    fully set forth herein.

10    169.    Defendants X and X.AI, by and through their officers, directors, employees, or

11    other representatives, entered into an unlawful agreement with each other in restraint of trade and

12    commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

13    170.    Defendants X and X.AI entered an unlawful agreement to leverage X's monopoly

14    power in the U.S. (or, alternatively, global) Microblogging Social Media Platforms Market to

15    confer a competitive advantage to X.AI and to foreclose X.AI's rivals, and, relatedly, to leverage

16    X's monopoly power in the Social Media about AI Market to achieve a monopoly for X.AI over

17    generative AI chatbots or AI Agents operating on X and to foreclose any and all AI Agent or

18    chatbot competitors and to exclude them from operating on X's platform or from accessing X's

19    data or user prompts.

20    171.    Defendants X and X.AI's agreement harms competition. The agreement forecloses

21    X.AI's rivals from a substantial share of the relevant generative AI chatbot market and the scale

22    necessary to compete while artificially advantaging Grok, the dominant and only generative AI

23    chatbot integrated into X's API and platform. Defendants' unlawful agreement reduces customer

24    choice, competition, and marketwide innovation and investment. As a result, both the ability to

25    innovate and output in the market for generative AI chatbots is significantly lower than in the but-

26    for world without the anticompetitive agreement.

27    172.    Plaintiffs' injury flows from the same conduct causing harm to competition.

28    Plaintiffs were injured, and continue to be injured, as a proximate cause of Defendants X and

1    X.AIs' unlawful agreement. Eliza's AI Agent software is foreclosed from the ability to compete

2    for additional customers against X.AI's Grok. Relative to the but-for world without the unlawful

3    agreement, Eliza's AI Agent software has less scale and receives less investment to develop

4    innovations to its generative AI models, which depresses Eliza's sales and revenues. These effects

5    combine to substantially reduce the value of Plaintiffs' business relative to the but-for world

6    without Defendants X and X.AI's anticompetitive conduct.

7        173.    Plaintiffs' injury likewise flows from the same conduct causing harm to

8    competition. Plaintiffs were injured, and continue to be injured, as a proximate cause of

9    Defendants' unlawful agreement. Plaintiffs provide software to create generative AI chatbots to

10   operate on X's platform and to compete with Grok. Defendants X and X.AI's conduct deprives

11   Eliza's products of scale and investment, which, among other harms, reduces Plaintiffs' ability to

12   innovate and develop product features relative to the but-for world without Defendants X and

13   X.AI's anticompetitive conduct.

14       174.    There are no procompetitive justifications for Defendants' unlawful agreement.

15   Defendants X and X.AI's anticompetitive agreement has no purpose or effect other than to reduce

16   competition between Grok and other generative AI chatbots and to insulate X and X.AI from

17   competition from AI developers.

18                        **CLAIM 2**

19   **Tying X's Social Media Platform with X.AI's Grok Chatbot in Violation of Section 1 of the**

20                **Sherman Act 15 U.S.C. § 1**

21                    **(Against All Defendants)**

22       175.    Plaintiffs restate, re-allege, and incorporate by reference each of the allegations set

23   forth in the rest of this Complaint as if fully set forth herein.

24       176.    Defendants X and X.AI's conduct violates Section 1 of the Sherman Act, which

25   prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in

26   restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1.

27       177.    X.AI Corp. has unlawfully tied its microblogging platform (X/Twitter), to its AI

28   Agent/chatbot Grok through its exclusive agreement to integrate Grok into X's API and operating

1  system.

2      178.    X has sufficient economic power in the tying market, the Microblogging Social

3  Media Platform Market, hosting over 80% of all daily microblogging posts, and more specifically

4  in the Social Media about AI Market, hosting over 90% of all discussions related to AI Agents.

5  X's market power is further evidenced by its ability to extract supra-competitive "license" or

6  "account" fees, including charging for verified user accounts, on what typically is (or used to be) a

7  "free[1]" social media platform.

8      179.    X uses its monopoly control over the social media platform to moderate content

9  that can be perceived as competing with X.AI's product Grok. X does this by, for example,

10  blocking Eliza's website, blocking Eliza's Github, and deplatforming Eliza and its founder Shaw

11  Walters so they are unable to participate in the largest global (or, alternatively, US-based)

12  conversation regarding the product they make – AI Agents or generative AI chatbots. X also

13  restricts other AI Agent use by having Terms of Service for all of its accounts that allow X to

14  deactivate accounts for any reason whatsoever at X's sole discretion, with no opportunity for

15  recourse because X receives vast immunity for publishing decisions, including deactivating user

16  accounts. By blocking and silencing competition, and by relying on overbroad Terms of

17  Service/Use to justify deplatforming all competition, X ensures that X.AI's Grok remains the only,

18  unchallenged AI Agent operable and integrated into the X ecosystem.

19      180.    X ties the use of any AI Agents to X.AI's Grok product. If a user seeks to use an AI

20  Agent or generative AI chatbot on X's platform, the user is prevented from using any product

21  except for Grok. Because X deplatforms competitors, users are prohibited from even learning

22  about potential Grok-alternatives because those voices are silenced in largest town hall for

23  discussing AI Agents and chatbots on the internet. X also blocks links from which users may

24  download products that compete with Grok, ensuring Grok's lone status.

25      181.    By integrating Grok, and only Grok, into its platform, users are forced to use Grok.

26

27  [1] "Free" is a misnomer because users pay by giving their data away, which such data social media
platforms do not pay tax on despite it constituting a great source of monetization for reselling

28  specifics about customers to advertisers.

1   If users want additional functionality that, for example, Eliza's AI Agent software would allow

2   them to build, then users must pay a monthly subscription fee to access Super Grok or Grok

3   Premium. Users are without choice to select other AI products or to obtain the same features for

4   free or from other providers.

5           182.     X and X.AI's foreclosure of alternative AI Agents/chatbots on X ties two separate

6   products that are in separate markets.

7           183.     X's conduct substantially forecloses competition in the AI Agent on social media

8   market or the microblogging market, affecting a substantial volume of commerce in these

9   Markets.

10           184.     The X Entities have thus engaged in a *per se* illegal tying arrangement and the

11   Court does not need to engage in a detailed assessment of the anti-competitive effects of their

12   conduct or its purported justifications.

13           185.     In the alternative only, even if the X Entities' conduct does not constitute a *per se*

14   illegal tie, a detailed analysis of their tying arrangement would demonstrate that this arrangement

15   violates the rule of reason and is illegal.

16           186.     Plaintiffs, with their own AI Agent products and desire to promote, discuss, and

17   provide their products to the public, have been harmed by Defendants' anti-competitive conduct in

18   a manner that the antitrust laws were intended to prevent. Plaintiffs have suffered and continue to

19   suffer damages and irreparable injury, and such damages and injury will not abate until an

20   injunction ending X's anti-competitive conduct issues.

21                                   **CLAIM 3**

22   **Unreasonable Restraints of Trade Concerning X's Terms of Service in Violation of Section 1**

23                   **of the Sherman Act 15 U.S.C. § 1**

24                         **(Against All Defendants)**

25           187.     Plaintiffs restate, re-allege, and incorporate by reference each of the allegations set

26   forth in the rest of this Complaint as if fully set forth herein.

27           188.     The X Entities' conduct violates Section 1 of the Sherman Act, which prohibits

28   "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade

PLAINTIFFS' AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE AND DECLARATORY RELIEF

1    or commerce among the several States, or with foreign nations." 15 U.S.C. § 1.

2        189.    X has entered into agreements with users that unreasonably restrict competition in

3    the Social Media about AI antitrust market. These agreements allow X to deplatform users for any

4    reason whatsoever, exclusively at X's direction, and without any meaningful opportunity for

5    remedial actions leading to account reactivation.

6        190.    The X Entities wield this provision within X's user agreements to thwart

7    competition and to protect X's own product and brand, such as Grok.

8        191.    Having compete control over competition as the dominant player with monopoly

9    power in the microblogging social media platform unreasonably restrains competition in this

10    market because at Defendants' discretion, without oversight, Defendants may – and do – silence

11    the voices of their competitors as well as links to their competitors offerings, meanwhile creating

12    an exclusive market for the X Entities' own Grok.

13        192.    Allowing X unilateral discretion to terminate and to deplatform competitors

14    without consequences and without remedies for the users serves no legitimate or pro-competitive

15    purpose that could justify their anti-competitive effects, and thus unreasonably restrain and

16    substantially foreclose competition in the AI Agent on X Market.

17        193.    Defendants' conduct has substantial anti-competitive effects, including increased

18    prices and costs, reduced innovation and quality of service, and lowered output.

19        194.    As a potential competing AI Agent provider, Plaintiffs have been harmed by

20    Defendants' anticompetitive conduct of silencing competition on the X platform in a manner that

21    the antitrust laws were intended to prevent. Plaintiffs have been foreclosed from the market and

22    has suffered and continues to suffer damages and irreparable injury, and such damages and injury

23    will not abate until an injunction ending Defendants' anti-competitive conduct issues.

24                                        **CLAIM 4**

25    **Monopolization and Monopoly Maintenance in Violation of Section 2 of the Sherman Act, 15**

26                                        **USC § 2**

27                                  **(Against All Defendants)**

28        195.    Plaintiffs restate, re-allege, and incorporate by reference each of the allegations set

**PLAINTIFFS' AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE AND DECLARATORY RELIEF**

1    forth in the rest of this Complaint as if fully set forth herein.

2        196.    "Section 2 of the Sherman Act makes it unlawful for a firm to 'monopolize.'"

3    *United States v. Microsoft*, 253 F.3d 34, 50 (D.C. Cir. 2001) (citing 15 U.S.C. § 2). The offense of

4    monopolization requires proof of two elements: "(1) the possession of monopoly power in the

5    relevant market and (2) the willful acquisition or maintenance of that power as distinguished from

6    growth or development as a consequence of a superior product, business acumen, or historic

7    accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966).

8        197.    Defendants have engaged in business activities that constitute unlawful

9    monopolistic behavior in restraint of competition within the meaning of Section 2 of the Sherman

10   Act, 15 USC § 2.

11       198.    Defendants willfully acquired and/or maintained monopoly power in the relevant

12   antitrust markets of Microblogging Social Media Platforms, Generative AI Chatbots or AI Agents,

13   and/or Social Media about AI through anticompetitive conduct.

14       199.    Defendants' anticompetitive conduct includes, but is not limited to, exclusive

15   dealing, refusals to deal with competitors, refusing to share essential facilities (the X platform,

16   where over 90% of social media discussions about AI Agents occur) with competitors, using a

17   dominant position in one relevant antitrust market (the Microblogging Social Media Platforms

18   Market and/or the Social Media about AI Market) to gain an uncompetitive advantage in another

19   (the AI Agents operating on Social Media Market and/or the Generative AI Chatbot Market),

20   unlawful monopoly leveraging, and/or vertical foreclosure (by prohibiting any and all other AI

21   Agents from integrating into X's platform and providing exclusive access to X.AI's Grok only).

22       200.    Plaintiffs' and Defendants' AI offerings have occurred in and have a substantial

23   effect on interstate commerce.

24       201.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs have

25   suffered injury to business and property, including but not limited to lost sales, reduced

26   fundraising capabilities, reduced access to capital and investments, reduced client communication

27   and contact, impeded market access, and diminished competitive opportunities, harm to

28   reputation, harm to products, other harm identified and alleged herein, and additional ongoing

1    harm to be determined.

2        202.    Plaintiffs' injuries flow directly from the anticompetitive effects of Defendants'

3    monopolistic conduct, their attempts to obtain monopoly power, and their attempts to leverage a

4    monopoly in one market to obtain a monopoly in a second unrelated market, and is of the type that

5    the antitrust laws are designed to prevent.

6        203.    Defendants conduct has not been the result of superior product, business acumen,

7    or historic accident, but rather of deliberate exclusionary practices designed to suppress

8    competition and maintain monopoly power.

9        204.    Plaintiffs have been injured in its business and property as a result of Defendants'

10    unlawful conduct, as described herein.

11        205.    There are no procompetitive effects or justifications for Defendants' actions.

12    <u>**CLAIM 5**</u>

13    <u>**Unlawful Monopolization and Monopoly Maintenance in Violation of Section 2 of the**</u>

14    <u>**Sherman Act, 15 USC § 2**</u>

15    **(Against Defendant X Corp.)**

16        206.    Plaintiffs restate, re-allege, and incorporate by reference each of the allegations set

17    forth in the rest of this Complaint as if fully set forth herein.

18        207.    X's conduct violates Section 2 of the Sherman Act, which prohibits the

19    "monopoliz[ation of] any part of the trade or commerce among the several States, or with foreign

20    nations". 15 U.S.C. § 2.

21        208.    The Microblogging Social Media Platform Market is a valid antitrust market. In the

22    alternative, the Social Media about AI Market is a valid antitrust market.

23        209.    X holds monopoly power in the Microblogging Social Media Platforms Market and

24    the Social Media about AI Market.

25        210.    X has unlawfully acquired monopoly power in these Markets, including through

26    the anti-competitive acts described herein. And however X initially acquired its monopoly, it has

27    unlawfully maintained its monopoly, including through the anti-competitive acts described herein.

28        211.    X's conduct affects a substantial volume of interstate as well as foreign commerce.

1    212.    X's conduct has substantial anti-competitive effects, including increased prices and

2  costs, reduced innovation and quality of service, and lowered output.

3    213.    As an AI Agent software developer and an AI company, Plaintiffs have been

4  harmed by Defendants' anti-competitive conduct in a manner that the antitrust laws were intended

5  to prevent. Plaintiffs have suffered and continue to suffer damages and irreparable injury, and such

6  damages and injury will not abate until an injunction ending X's anti-competitive conduct issues.

7    214.    There are no procompetitive effects or justifications for Defendants' actions.

8  **CLAIM 6**

9  **Unlawful Monopolization and Monopoly Maintenance in Violation of Section 2 of the**

10  **Sherman Act, 15 USC § 2**

11  **(Against Defendant X.AI LLC and X.AI Corp.)**

12    215.    Plaintiffs restate, re-allege, and incorporate by reference each of the allegations set

13  forth in the rest of this Complaint as if fully set forth herein.

14    216.    X.AI LLC and X.AI Corp.'s conduct violates Section 2 of the Sherman Act, which

15  prohibits the "monopoliz[ation of] any part of the trade or commerce among the several States, or

16  with foreign nations". 15 U.S.C. § 2.

17    217.    The Generative AI Chatbots or AI Agents Market is a valid antitrust market. In the

18  alternative, the Social Media about AI is a valid antitrust market.

19    218.    X.AI LLC and X.AI Corp. hold monopoly power in the and the Social Media about

20  AI and in the Generative AI Chatbots or AI Agents Market.

21    219.    X.AI LLC and X.AI Corp. have has unlawfully acquired monopoly power in these

22  Markets, including through the anti-competitive acts described herein. And however X.AI LLC

23  and X.AI Corp. initially acquired their monopoly, they have unlawfully maintained their

24  monopoly, including through the anti-competitive acts described herein.

25    220.    X.AI LLC and X.AI Corp.'s conduct affects a substantial volume of interstate as

26  well as foreign commerce.

27    221.    X.AI LLC and X.AI Corp.'s conduct has substantial anti-competitive effects,

28  including increased prices and costs, reduced innovation and quality of service, and lowered

Case No. 3:25-cv-07243-AMO

**PLAINTIFFS' AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE AND DECLARATORY RELIEF**

1  output.

2      222.    As an AI Agent software developer and an AI company, Plaintiffs have been

3  harmed by X.AI LLC and X.AI Corp.'s anti-competitive conduct in a manner that the antitrust

4  laws were intended to prevent. Plaintiffs have suffered and continue to suffer damages and

5  irreparable injury, and such damages and injury will not abate until an injunction ending X.AI

6  LLC and X.AI Corp.'s anti-competitive conduct issues.

7      223.    There are no procompetitive effects or justifications for X.AI LLC and X.AI

8  Corp.'s actions.

9

10                                    **CLAIM 7**

11  **Attempted Monopolization in Violation of Section 2 of the Sherman Act, 15 USC § 2**

12                              **(Against All Defendants)**

13      224.    Plaintiffs restate, re-allege, and incorporate by reference each of the allegations set

14  forth in the rest of this Complaint as if fully set forth herein.

15      225.    Defendants' conduct violates Section 2 of the Sherman Act, which prohibits the

16  "monopoliz[ation of] any part of the trade or commerce among the several States, or with foreign

17  nations". 15 U.S.C. § 2.

18      226.    The Microblogging Social Media Platforms Market is a valid antitrust market. The

19  Social Media about AI Market is a valid antitrust market. Generative AI Chatbots or AI Agents is

20  a valid antitrust market.

21      227.    Defendant X holds monopoly power in the Microblogging Social Media Platforms

22  Market and the Social Media about AI Market.

23      228.    X has unlawfully acquired monopoly power in these Markets, including through

24  the anti-competitive acts described herein. And however X initially acquired its monopoly, it has

25  unlawfully maintained its monopoly, including through the anti-competitive acts described herein.

26      229.    Defendants X.AI LLC and X.AI Corp., acting in concert with X, attempt to acquire

27  monopoly power in the Social Media about AI Market and the Generative AI Chatbots or AI

28  Agents Market by the anticompetitive acts described herein.

230. Defendants' anticompetitive conduct affects a substantial volume of interstate as well as foreign commerce.

231. Defendants' conduct has substantial anti-competitive effects, including increased prices and costs, reduced innovation and quality of service, and lowered output.

232. As an AI Agent software developer and an AI company, Plaintiffs have been harmed by Defendants' anti-competitive conduct in a manner that the antitrust laws were intended to prevent. Plaintiffs have suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Defendants' anti-competitive conduct issues.

233. There are no procompetitive effects or justifications for Defendants' actions.

## CLAIM 8

## Vertical Restraints of Trade and Tying of X's Microblogging Platform to X.AI's Grok in Violation California's Cartwright Act

### (Against All Defendants)

234. Plaintiffs restate, re-allege, and incorporate by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

235. Defendants' acts and practices detailed above violate the Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*, which prohibits, *inter alia*, the combination of resources by two or more persons to restrain trade or commerce, or to prevent market competition. *See* §§ 16720, 16726.

236. Under the Cartwright Act, a "combination" is formed when the anticompetitive conduct of a single firm coerces other market participants to involuntarily adhere to the anti-competitive scheme.

237. The Cartwright Act also makes it "unlawful for any person to lease or make a sale or contract for the sale of goods, merchandise, machinery, supplies, commodities for use within the State, or to fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement or understanding that the lessee or purchaser thereof shall not use or deal in the goods, merchandise, machinery, supplies, commodities, or services of a competitor or

competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement or understanding may be to substantially lessen competition or tend to create a monopoly in any line of trade or commerce in any section of the State." § 16727.

238.    As detailed above, the X Entities have unlawfully tied their X platform, which has a monopoly in the relative antitrust market of Microblogging Social Media Platforms, to their Grok AI Agent/chatbot through exclusive dealing agreements and intentionally and willfully excluding competition thereby unreasonably restraining trade.

239.    X has sufficient economic power in the tying market, the Microblogging Social Media Platforms Market, hosting over 80% of all daily microblogging posts, and more specifically in the Social Media about AI, hosting over 90% of all discussions related to AI Agents. X's market power is further evidenced by its ability to extract supra-competitive "license" or "account" fees, including charging for verified user accounts, on what typically is (or used to be) a "free" social media platform.

240.    X uses its monopoly control over the social media platform to moderate content that can be perceived as competing with X.AI's product Grok. X does this by, for example, blocking Eliza's website, blocking Eliza's Github, and deplatforming Eliza and its founder Shaw Walters so they are unable to participate in the largest global (or, alternatively, US-based) conversation regarding the product they make—AI Agents or generative AI chatbots. X also restricts other AI Agent use by having Terms of Service for all of its accounts that allow X to deactivate accounts for any reason whatsoever at X's sole discretion, with no opportunity for recourse because X receives vast immunity for publishing decisions, including deactivating user accounts. By blocking and silencing competition, and by relying on overbroad Terms of Service/Use to justify deplatforming all competition, X ensures that X.AI's Grok remains the only, unchallenged AI Agent operable and integrated into the X ecosystem.

241.    X ties the use of any AI Agents to X.AI's Grok product. If a user seeks to use an AI Agent or generative AI chatbot on X's platform, the user is prevented from using any product except for Grok. Because X deplatforms competitors, users are prohibited from even learning about potential Grok-alternatives because those voices are silenced in largest town hall for

discussing AI Agents and chatbots on the internet. X also blocks links from which users may download products that compete with Grok, ensuring Grok's lone status.

242.    By integrating Grok, and only Grok, into its platform, users are forced to use Grok. If users want additional functionality that, for example, Eliza's AI Agent software would allow them to build, then users must pay a monthly subscription fee to access Super Grok or Grok Premium. Users are without choice to select other AI products or to obtain the same features for free or from other providers.

243.    X and X.AI's foreclosure of alternative AI Agents/chatbots on X constitutes tying of two separate products in distinct markets.

244.    X's conduct substantially forecloses competition in the AI Agent on social media market or the Microblogging Social Media Platforms Market, affecting a substantial volume of commerce in these Markets.

245.    The X Entities have thus engaged in a *per se* illegal tying arrangement and the Court does not need to engage in a detailed assessment of the anti-competitive effects of their conduct or its purported justifications.

246.    In the alternative only, even if the X Entities' conduct does not constitute a *per se* illegal tie, a detailed analysis of their tying arrangement would demonstrate that this arrangement violates the rule of reason and is illegal.

247.    Plaintiffs, with their own AI Agent products and desire to promote, discuss, and provide their products to the public, have been harmed by Defendants' anti-competitive conduct in a manner that the antitrust laws were intended to prevent. Plaintiffs have suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending X's anti-competitive conduct issues

## CLAIM 9

## Intentional Misrepresentation

### (Against X)

248.    Plaintiffs restate, re-allege, and incorporate by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

22175305.4

249.    Defendant X made knowingly false representations to Eliza Corp that it would reinstate and/or not deactivate Plaintiffs' accounts if Plaintiffs shared knowhow and implementation specifics about its AI Agents with X.

250.    At the time X made these representations, it knew they were false (or made the representations recklessly without regard for their truth) because X never intended to reinstate or reactivate Plaintiffs accounts, but rather sought to extract as much detailed information as possible from Plaintiffs so X could create its own AI Agents copying Plaintiffs' AI Agents while eliminating Plaintiffs as competition with deplatforming.

251.    Defendant intended that Plaintiffs rely on its representations that if Eliza provided sufficient documentation, X would reinstate Plaintiffs' account.

252.    Plaintiffs reasonably relied on Defendant's representations.

253.    Plaintiffs reliance was a substantial factor in causing Plaintiffs the harm of allowing X to launch its AI Agents on X while Plaintiffs' AI Agents remained dormant awaiting account reactivation, which hindered Plaintiffs' ability to attract and retain customers, obtain followers, communicate with followers, conduct business, and receive funding, and allowed X to benefit from its AI Agent becoming the adopted standard instead of Eliza's AI Agent, and further harmed Plaintiffs and unjustly enriched Defendant as will be discovered and proven.

254.    Because X committed the above acts and omissions maliciously, wantonly, and oppressively, Plaintiffs are entitled to punitive damages.

### CLAIM 10

### Concealment

### (Against X)

255.    Plaintiffs restate, re-allege, and incorporate by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

256.    Defendant intentionally failed to disclose that, no matter what Plaintiffs did, shared, explained, or did not do, Defendant would be deplatforming and/or not reactivating Plaintiffs' X accounts, and Plaintiffs could not have reasonably discovered this because such knowledge and information, including the fact that Defendant intended to launch a product competing with

1   Plaintiffs', is within X's purview and knowledge only.

2        257.    X intended to deceive Plaintiffs by concealing the facts that it always planned to

3   deplatform Plaintiffs and would never, no matter how much information Plaintiffs shared,

4   reactivate Plaintiffs' accounts or not deplatform Plaintiffs.

5        258.    Had X explained that (1) it deplatformed Plaintiffs because it sought to launch a

6   product to compete with Plaintiffs' and it did not want Plaintiffs' free product to affect X's

7   product's success (2) it sought to engage Plaintiffs to explain Plaintiffs' AI Agent so that X could

8   effectively recreate the equivalent product or, at a minimum, be certain Plaintiffs' product did not

9   have functionality that Defendant's product lacked and (3) Defendant always intended to

10  deplatform Plaintiffs because Plaintiffs were a competitor and provided open source software that

11  enabled direct competition with X's AI Agents, Plaintiffs would have behaved differently.

12       259.    Defendant's concealment was a substantial factor in causing harm to Plaintiffs.

13       260.    Plaintiffs were damaged insofar as they waited months complying with X's

14  informational demands and awaiting platform access, sharing information and knowhow they

15  would not otherwise have provided to X. During this time, Plaintiffs could not communicate with

16  customers, community members, funders, and potential investors, nor were Plaintiffs involved in

17  seeking new communication avenues because they believed X was acting in good faith and would

18  eventually reinstate their accounts. Plaintiffs were also damaged by X's launching an equivalent

19  AI Agent that was able, and continues to be able, to attract customers and use without any

20  competition from Plaintiffs' AI software products, which are deactivated because of Plaintiffs'

21  deplatforming and because X's ongoing ban to posting links to Plaintiffs' products. Defendant was

22  unjustly enriched by copying Plaintiffs' AI Agent, rebranding and launching the equivalent AI

23  Agent based on Plaintiffs' knowhow, and eliminating Plaintiffs' competition for AI Agents in an

24  amount to be proven at trial.

25       261.    Because X committed the above acts and omissions maliciously, wantonly, and

26  oppressively, Plaintiffs' are entitled to punitive damages.

27

28

# CLAIM 11

## False Promise

### (Against X)

262.    Plaintiffs restate, re-allege, and incorporate by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

263.    X promised Plaintiffs that if they demonstrated that they were in full compliance with X's terms and conditions (Plaintiffs were) and provided additional details explaining Plaintiffs' full compliance, X would reactivate Plaintiffs' accounts.

264.    X never intended to reinstate Plaintiffs' accounts and instead intended to extract as much information from Plaintiffs about AI Agents as possible while delaying and distracting Plaintiffs so X could launch a competing product.

265.    X intended that Plaintiffs rely on X's promise that it would reactivate Plaintiffs' accounts if Plaintiffs provided all the detailed information X requested.

266.    Plaintiffs reasonably relied on X's promise.

267.    X failed to perform its promise and, despite Plaintiffs' full compliance with all of X's terms and conditions and requests for information, never reactivated Plaintiffs' accounts.

268.    Plaintiffs' reliance on Defendant's promise of account reactivation over several months, during which Plaintiffs provided X with increasing operational details, was a substantial factor in causing harm to Plaintiffs.

269.    Plaintiffs were harmed by losing access to customers and supporters, having X supplant Plaintiffs' AI Agent with X's own AI Agent, providing technical know-how and detailed operations assistance to X to enable X to build a competing product, lost time waiting for account reactivations, damage to reputation for being deplatformed for false accusations of terms and conditions violations, and other damages and harm that will be proven at trial, including Defendant's unjust enrichment by copying Eliza's AI Agents and deploying the copies without competition from Plaintiffs.

270.    Because X committed the above acts maliciously, wantonly, and oppressively, Plaintiffs are entitled to punitive damages.

22175305.4

**CLAIM 12**

**Cal. Bus. & Prof. Code § 17200**

**(Against All Defendants)**

271.    Plaintiffs restate, re-allege, and incorporate by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

272.    Defendants conduct, described above, violates California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*, which prohibits any unlawful, unfair or fraudulent business act or practice.

273.    Plaintiffs have standing to bring this claim because it has suffered injury in fact and lost money as a result of Defendants' unfair competition. Specifically, Plaintiffs develop and provide AI Agents capable of operating on X's platform and Defendants' conduct of blocking Plaintiffs' website and Github, deactivating Plaintiffs' accounts, meanwhile promoting X.AI's Grok product, integrating Grok into X's platform, and granting all users access to Grok with additional features locked for payment, and has unreasonably restricted Plaintiffs' ability to fairly compete in the relevant markets with Defendants' Grok product.

274.    The X Entities' conduct violates the Sherman Act and the Cartwright Act, and thus constitutes unlawful conduct under § 17200.

275.    Defendants' conduct is also "unfair" within the meaning of the Unfair Competition Law because it provides an unfair competitive advantage over Plaintiffs. Plaintiffs lawfully operated on X's platform and, solely because Plaintiffs' AI Agents competed with the X Entities' AI Agent Grok and its new functionalities, Defendants deplatformed Plaintiffs thereby impeding Plaintiffs' ability to operate its AI Agents on X's platform, harming Plaintiffs. This conduct is contrary to public policy and undermines consumer protections to be free from anticompetitive actors abusing their monopoly positions to reduce competition and increase consumer costs.

276.    Defendant X's representations that Plaintiffs could operate on X's platform if in full compliance with X's terms and conditions were false or misleading, as were Defendant X's representations that, if Plaintiffs provided additional details about the operations of their AI Agents, X would either not deplatform Plaintiffs or would reactivate Plaintiffs' accounts. Such

22175305.4

1    misrepresentations were likely to deceive Plaintiffs. Plaintiffs relied on Defendant X's

2    representations and would not have provided additional information to Defendant X had Plaintiffs

3    known that Defendant X would either deplatform or refuse to reactivate Plaintiffs' accounts or that

4    Defendants would be launching a competing AI Agent that copied Plaintiffs' preexisting AI

5    Agent.

6          277.    As a direct and proximate result of Defendants' acts and omissions, Plaintiffs

7    suffered injury in fact and lost money or property. Specifically, Plaintiffs paid for license fees and

8    the gold check mark for accounts it cannot use, lost customer contact, cannot launch its AI Agent

9    products, which it spent considerable time, money and energy developing, lost customers to

10   Defendants, lost funding and influence opportunities, and lost the chance to build its brand and

11   further disseminate their AI Agents and proposed novel AI applications.

12         278.    Defendants were also unjustly enriched by creating a product that copied Plaintiffs'

13   existing product using Plaintiffs' knowhow and detailed implementation explanations and

14   marketing and selling that product to customers free of competition from Plaintiffs. Defendants

15   were also unjustly enriched by avoiding development costs for its AI Agents.

16         279.    The X Entities' conduct harms Plaintiffs which, as a direct result of Defendants'

17   anti-competitive conduct, is unreasonably prevented from freely distributing its AI Agent software

18   and is banned from participating in discussions in the largest gathering of AI enthusiasts,

19   developers, investors, and users on social media on the internet.

20         280.    Pursuant to Business and Professions Code §§ 17203 and 17204, Plaintiffs seek

21   restitution, disgorgement of ill-gotten gains, and injunctive relief prohibiting Defendants from

22   continuing the unlawful, unfair, and fraudulent practices described herein.

## CLAIM 13

### Unjust Enrichment

### (Against All Defendants)

26         281.    Plaintiffs repeat and reallege the foregoing paragraphs as if fully set and

27   incorporated herein.

28         282.    Beginning in 2024, X began to pump Plaintiffs for information about developing

and creating AI Agents and other AI projects on X.

283.    On or around this time, the X Entities received billions in investment funding for AI projects.

284.    Instead of paying Plaintiffs for their detailed analysis, and instead of allowing Plaintiffs to operate in full compliance with X's terms and conditions on X's platform, X extracted critical AI information and details from Plaintiffs, built a product to compete with ElizaOS, deplatformed Plaintiffs, continued to push Plaintiffs for implementation details on AI Agents, and finally launched a product that competed with Plaintiffs AI Agents, meanwhile eliminating all competition from Plaintiffs by deplatforming them.

285.    By extracting this information and knowhow from Plaintiffs, which X did fraudulently by obtaining it in exchange for false promises of collaboration in the AI space and/or account reactivation, and by avoiding expending for software development costs, X was unjustly enriched at the expense of Plaintiffs.

286.    The X Entities acting together knowingly received and benefitted from deplatforming Plaintiffs which enabled them to unjustly obtain knowhow, information and details. This in turn allowed X to launch a competitor product, without development costs, and for which such product, information, and market share is rightfully Plaintiffs'.

287.    There is no justification for the X Entities' conduct.

288.    As a direct and proximate result of the X Entities' unjust enrichment, Plaintiffs have suffered and continue to suffer damages.

22175305.4

**PRAYER FOR RELIEF**

Plaintiffs respectfully request that the Court enter judgment in Plaintiffs' favor and against Defendant X on all counts and order as follows:

A.    Declare that X is not immune under 47 USC § 230 for deplatforming Plaintiffs;

B.    Enjoin X from deplatforming Plaintiffs' Twitter/X accounts ("@ElizaOS" and "@shawmakesmagic");

C.    Enjoin X from demanding Plaintiffs pay additional sums to operate under its existing developer accounts;

D.    Enjoin X from blocking on X any links to Plaintiff's website;

E.    Enjoin X from blocking on X any links to Plaintiff's GitHub;

F.    Enjoin X from blocking on X any links to any website advertising, marketing, discussing, promoting, and/or allowing the download of Plaintiffs' products or AI software;

G.    Order X to restore access to Plaintiffs' Twitter/X accounts ("@ElizaOS" and "@shawmakesmagic");

H.    Order X to disgorge to Plaintiffs all funds unjustly obtained from its unlawful, anticompetitive, fraudulent, and wrongful conduct;

I.    Order X to compensate Eliza Labs for all the harm incurred as a result of X's fraudulent actions;

J.    Order X to compensate Eliza Labs for all the harm incurred as a result of X's unfair competition and Cartwright Act violations;

K.    Declare that Defendant violated Section 2 of the Sherman Act;

L.    Award treble damages pursuant to 15 U.S.C. § 15;

M.    Enjoin X to prevent further anticompetitive conduct under 15 U.S.C. § 26;

N.    For an award of costs of suit, including reasonable attorneys' fees;

O.    For punitive damages in an amount to be determined at trial;

P.    For interest on all sums to the fullest extent of the law; and

Q.    For such other and further relief as the Court deems just and proper under the circumstances.

1

## <u>DEMAND FOR JURY TRIAL</u>

2

Plaintiffs demand a trial by jury on each of its causes of action that are triable before a

3

jury.

4

DATED:  September 23, 2025                    HANSON BRIDGETT LLP

5

6

7

By:    _____/s/Matthew F. Miller_____

8

MATTHEW F. MILLER
BATYA F. FORSYTH

9

SUSANNA L. CHENETTE
***Attorneys for Plaintiffs***

10

ELIZA LABS, INC. and SHAW WALTERS

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

22175305.4

PLAINTIFFS' AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE AND DECLARATORY RELIEF